# SUPREME JUDICIAL COURT

#### FOR THE

## COUNTY OF MIDDLESEX, OCTOBER TERM 1834, AT CAMBRIDGE.

###### PRESENT:

Hon. LEMUEL SHAW, Chief Justice,
Hon. SAMUEL PUTNAM, ⎱
Hon. SAMUEL S. WILDE, ⎰ Justices.
Hon. MARCUS MORTON, ⎰

---

## Jeduthun Wellington *et al.* Petitioners &c.

*It seems,* that a statute will in no case be deemed absolutely void.

Where an act of the legislature is alleged to be void, on the ground that it exceeds the limits of legislative power and thus injuriously affects private rights, it is to be deemed void only in respect to those particulars, and as against those persons, whose rights are thus affected.

If it appear that a legislative act may or may not be valid according to circumstances, the existence of those circumstances which will give it validity will be presumed, until the contrary is shown. Thus, if an act appears on the face of it to be an encroachmen on the rights of any persons, but would nevertheless be valid if passed with the consent of those persons, it will be presumed, that such consent was given; and a stranger will have no right to contest its validity upon the ground that such consent was not given.

At a meeting of the proprietors of common and undivided lands in Cambridge, in 1769, it was voted, that all the common lands fronting the college, should be granted to the town of Cambridge, to be used as a training-field, to lie undivided and to remain for that use forever, provided, that if the town should dispose of, grant or appropriate the same or any part thereof to any other use, the whole of the premises should revert to the proprietors. By *St.* 1830, *c.* 6, certain inhabitants of Cambridge were empowered, at their own expense and under the direction of two commissioners to be appointed by the executive, to enclose such part or parts of these lands as the commissioners should determine, and to level the surface, plant

Wellington
et al.
Petitioners
&c.

trees and lay out walks within the enclosure, with the approbation of the selectmen of Cambridge, leaving suitable avenues for foot passengers to enter or pass over it; the commissioners were authorized to make such alterations with respect to the direction of the roads by which the lands were traversed, as they should see fit ; the enclosure was to be forever appropriated to public use only, as a public park, promenade, and place for military parade; and provision was made for the punishment of any person who should injure or destroy the fences, &c. In 1832, after the enclosure, in pursuance of *St.* 1830, *c.* 6, of a portion of the lands, over which a road had previously passed, a petition was presented to the county commissioners, by certain individuals, praying that a new highway might be laid out across the land enclosed. The county commissioners having adjudged, that by reason of the *St.* 1830, *c.* 6, and the proceedings under it, they had no power to lay out a high-way across the enclosure, nor jurisdiction over the same, the petitioners made application to this Court for a mandamus requiring the county commissioners to take jurisdiction of their petition, and to determine whether such new highway was of common convenience and necessity. Upon the hearing of such application, it was objected, that the *St.* 1830, *c.* 6, was unconstitutional and void, because the Commonwealth did not own the soil, and the legislature had no authority to appropriate the land to public use, without the express consent of the owners. It was *held,* that the consent of the owners in such case might be given subsequently as well as previously, and that it might be presumed as well as proved by some positive act; but that at any rate, such objection could not be taken by the petitioners, who were strangers claiming no interest in the soil.

The *St.* 1830, *c.* 6, was *held* not to be unconstitutional, although there was no distinct adjudication by the legislature that the enclosure and improvement of the lands were of common convenience and necessity.

Nor is it unconstitutional on the ground, that no provision is made therein for compensation for damage done to private property ; for even if this were a valid objection to a statute affecting private property, it could have no force here, because the act contemplates no property not already appropriated to public use.

Nor on the ground, that no provision is made for the maintenance and repair of the roads laid out by the special commissioners around the enclosures, in lieu of those by which the land was originally traversed ; for the roads so laid out being lawful highways, the town thereupon became liable to the duty of supporting them as such.

Nor on the ground, that no provision is made for the preservation and support of the improvements when made.

Nor on the ground, that the section of the act providing that the enclosure should be *forever* appropriated to public use only as a public park and place for military parade, encroaches upon the right of *eminent domain* inherent in the sovereign power of the State ; for this right is not superseded by the act, the word *forever* in this connexion signifying, until the provision should be altered by competent authority.

The term *undivided,* applied to this land in the vote of the proprietors, does not mean that the land shall not be divided in parcels, but that it shall not be set off in severalty to individual proprietors.

The enclosure of the land in three distinct parcels and the other improvements and appropriations contemplated by the *St.* 1830, *c.* 6, were *held* not to be inconsistent with that clause in the grant of the proprietors, which provides that the land should be used as a training-field and should lie undivided, and that if it should be appropriated by the town to any other use, it should revert to the proprietors ; and consequently, the consent of the town to the statute, and to the improvements made by virtue of it, could not operate a forfeiture of the land by the town

Wherever the legislature has annexed the character of public use to any property, and such public use would be destroyed or interrupted by the laying out of a highway, the power of the county commissioners to lay out such highway is superseded. Thus, the *St.* 1830, *c.* 6, authorizing "the enclosing of a part of Cambridge common," superseded the power of the county commissioners to lay out a highway across such enclosure.

Whether, where a petition for a new highway is presented to the county commissioners by certain private individuals, and the county commissioners order that no further proceedings shall be had upon the petition, the petitioners merely as such are warranted in applying to this Court for a writ of mandamus to the county commissioners, *quære.*

THE facts in this case were stated by *Shaw* C. J., in delivering the opinion of the Court, as follows : This is a petition to this Court for a writ of *mandamus* to the county commissioners of this county, requiring them to proceed and determine, whether a certain highway and county road, prayed for by the petitioners or some of them, to be laid out over Cambridge common, be not of common convenience and necessity, and if found to be so, then requiring them to proceed and lay out the highway, according to the petition. The commissioners as parties adversely interested and opposing the petition, having voluntarily appeared, to show cause, the question now is, whether the writ shall be granted as moved for. Accompanying the petition is a transcript of the record of the doings of the commissioners, by which it appears that in April 1832, a petition was presented to the commissioners, stating that public convenience and necessity required that a new highway should be made across Cambridge common. Various proceedings and adjournments were had, and various parties were heard before the commissioners ; and it was submitted and contended on the part of the opponents, that the commissioners had no jurisdiction, power, or authority to lay out a highway over the place proposed, because the legislature, by an act passed June 5, 1830, (*St.* 1830, *c.* 6,) had set apart and appropriated the common to public uses, which were inconsistent with the use of it as a highway, and that this special appropriation by legislative authority, superseded the general authority of the county commissioners. By the terms of the act it was provided, that Israel Porter and his associates should be empowered, at their own expense, and under the direction of two commissioners to be appointed by the exec-

utive, to enclose such part or parts of Cambridge common as the commissioners should determine, due regard being had to public convenience and necessity ; and the commissioners were authorized to make such alterations in the direction of the roads, by which the common was traversed, as they should see fit.  They were to make their return of their doings to the secretary's office.  It was further provided, that Porter and his associates should be empowered to level the surface of the ground, to plant trees, to lay out and make walks within the enclosure, in such manner as, with the approbation of the selectmen of the town, they should think proper, leaving suitable avenues, for any persons having occasion to pass over any part of the enclosure on foot.  It was further provided and declared, that the enclosure should be forever kept and appropriated to public use only, as a public park, promenade, and place for military parade, and that no part thereof should on any pretence be appropriated to any purpose of private use and emolument.  The act then makes provision for the preservation of the fences, trees, and other improvements, made in pursuance of the act, by penalties, and a remedy for damages against those who may destroy or injure them.

By a transcript from the secretary's office it appears, that commissioners were duly appointed, that they executed the duties assigned to them by the act and by their commission, and made their return in due form to the secretary's office. By their return it appears, among other things, that they authorized the enclosure of that part of the common over which the highway is now prayed for, by metes and bounds, and discontinued all highways within those limits.  It further appears, that before the petition of Jeduthun Wellington and others had been presented to the county commissioners, the persons mentioned in the act had enclosed this part of Cambridge common with a fence, and had levelled the same, planted trees, laid out gravel walks, and made the improvements authorized by the act, to fit the same for the public uses contemplated by the act.  It further appears, by several transcripts of records of the town of Cambridge, that at a town-meeting held in October 1830, to see, among other things, if the town would petition the legislature so far to repeal the act,

as to secure to the public the right to travel over the common, by the roads heretofore laid out, the town voted that the same be indefinitely postponed.

At another town-meeting, held November 1, 1830, to see, among other things, if the town would apply to the legislature to repeal the act, so far " as to secure to the public the right to travel over the common by the road passing by Dr. Hill's and the late Deacon Moore's to the road leading to Canal bridge," and also by the road heretofore called the Cambridge and Concord turnpike, and whether the town would take any other measures on the subject of enclosing Cambridge common, it was again voted that the subject should be indefinitely postponed.

At another meeting, held July 16, 1832, after the petition of Jeduthun Wellington and others had been presented to the county commissioners, to lay out the highway in question, and they had issued notice thereon, the meeting being called, among other things, to adopt such measures as might be deemed expedient in relation to an order of notice from the county commissioners on the petition of Jeduthun Wellington and others for laying out a road through the enclosure on Cambridge common, and in relation to the common, it was voted, that Joseph Story, Samuel P. P. Fay, and William J. Whipple be appointed a committee on behalf of the town, to take all suitable measures, which they might deem proper, effectually to oppose before the county commissioners and otherwise, the petition of Jeduthun Wellington and others, for a highway to be laid out over Cambridge common.

In regard to the title to the land in question, it appears among the doings of the commissioners, that Cambridge common was granted by the proprietors of common and undivided lands in Cambridge, November 20, 1769, to the town of Cambridge, by the following vote, to wit :

At a meeting &c., voted that all the common lands, belonging to the proprietors, fronting the college, (commonly called the town commons,) not heretofore granted or allotted to any particular person &c., be and the same is hereby granted to the town of Cambridge, to be used as a training field, to lie undivided, and to remain for that use for ever,

provided nevertheless, that if the said town should dispose of, grant or appropriate the same, or any part thereof, at any time hereafter, to or for any other use, than that aforementioned, then and in such case, the whole of the premises hereby granted to the said town, shall revert to the proprietors granting the same, and the present grant shall thereupon be deemed null and void, to all intents and purposes, as if the same had never been made.

It further appears, that the Cambridge and Concord turnpike was established by an act passed in 1803, (*St.* 1802, *c.* 124,) extending from Concord to the west side of Cambridge common ; that by an additional act, (*St.* 1804, *c.* 77,) the same was extended from the terminus at the west side of Cambridge common across the same, and to the causeway of West Boston bridge ; and that in 1829, by the consent of the proprietors of this turnpike, and by the act of the county commissioners, this turnpike was surrendered for a small consideration of $1000 paid to the proprietors, the whole of which sum was raised by subscription, and the turnpike road was opened as a public highway. It was proposed that the highway petitioned for, should be laid out across the common over the route of this turnpike road.

On this state of things, it was contended before the county commissioners, that by reason of the premises they had no power or authority to lay out a new highway on the route prayed for, or jurisdiction over the same ; whereupon, after hearing the parties upon these questions, it was considered and adjudged by them, that by the act of 1830, the proceedings of the commissioners, appointed by virtue of the act, and those of Israel Porter and others, in relation to Cambridge common, the county commissioners have no power or authority to lay out a common highway over and across that part of Cambridge common, enclosed with a fence as aforesaid, nor jurisdiction over the same, and consequently no authority to consider or determine whether it was of common convenience and necessity that a new highway should be laid out as petitioned for. They therefore declined hearing the parties upon that question, and ordered that no further proceedings should be had upon the petition.

Such was the state of these proceedings when the petition was presented to this Court for a writ of mandamus to the county commissioners, requiring them to proceed and take jurisdiction of that petition, and to consider and determine whether it be of common convenience and necessity, that the highway across the common be laid out as prayed for. And here two principal questions are presented to the consideration of this Court ; 1. Whether the statute passed June 5, 1830, providing for the enclosure and appropriation of Cambridge common, by the persons, in the manner and for the purposes therein stated, is a constitutional act of the legislature, having the force and effect of law ; and, 2. Whether, if so, it has the legal effect and operation to restrain and inhibit the county commissioners, in the ordinary exercise of their powers, from laying out and opening a highway, over and across that part of Cambridge common, which was authorized to be enclosed, by the act in question, and which has in fact been enclosed, in pursuance of the powers thereby given.

*J. Mason* and *A. Peabody*, for the petitioners, to the point, that a writ of mandamus was the proper remedy, and that these petitioners were entitled to apply for such remedy, cited 3 Bl. Comm. 110 ; *The People v. Judges of Washington,* 1 Caines's R. 511 ; *The People v. Judges of West Chester,* 2 Johns. Cas. 118 ; *S. C.* Colman's Cas. 135 ; *Sikes v. Ransom,* 6 Johns. R. 279 ; *The People v. Justices of Chenango,* 1 Johns. Cas. 179 ; *S. C.* 2 Caines's Cas. 319 ; *Fish v. Weatherwax,* 2 Johns. Cas. 215 ; *The People v. Columbia Common Pleas,* 1 Wendell, 297 ; *Ex parte Bacon,* 6 Cowen, 393 ; *Commonwealth v. Sessions of Hampden,* 2 Pick. 414 ; *Springfield v. Commissioners of Highways of Hampden,* 4 Pick. 68 ; *Rex v. Barker,* 3 Burr. 1265 ; *Rex v. Wiltshire Justices,* 3 Burr. 1530 ; *S. C.* 1 W. Bl. 467 ; *The King v. Carter,* 4 T. R. 246 ; *The King v. Justices of Derbyshire,* 1 W. Bl. 606 ; *Amherst's case,* 1 Ventris, 187 ; *Danvers v. Commissioners of Highways of Essex,* 6 Pick. 22 ; *Ex parte Jennings,* 6 Cowen, 519 ; *Hull v. Supervisors of Oneida,* 19 Johns. R. 259 ; *The People v. Champion,* 16 Johns. R. 61 ; and to the point, that the legislature could not deprive the State of the right of eminent domain, Puffend. *lib.* 8, *c.* 5, § 7 (p. 829) ; 2 Burlamaqui, 249.

Wellington
et al.
Petitioners
&c.

*Greenleaf* and *Fletcher*, *contrà*, to the point, that the en-closure of the common was a proper subject for the action of the legislature, cited Justin. Inst. *lib.* 2, *tit.* 1, § 1, *et seq* , *Case of the Isle of Ely*, 10 Coke, 141 ; *Hooker* v. *Cummings*, 20 Johns. R. 90 ; *Commonwealth* v. *Coombs*, 2 Mass. R. 489 ; *Hood* v. *Proprietors of Dighton Bridge*, 3 Mass. R. 263 ; *Arundel* v. *M'Culloch*, 10 Mass. R. 70 ; *Common-wealth* v. *Charlestown*, 1 Pick. 180 ; *Commonwealth* v. *Breed*, 4 Pick. 460 ; *St.* 1801, *c.* 69 ; *St.* 1802, *c.* 59 ; *St.* 1823, *c.* 119 ; that the legislature have power, at any time, to dis-continue or regulate a highway, *Wales* v. *Stetson*, 2 Mass R. 143 ; *West Boston Bridge* v. *County Commissioners of Mid-dlesex*, 10 Pick. 270 ; *Commonwealth* v. *Breed*, 4 Pick. 463 ; that the county commissioners derive all their authority from the legislature, and that the legislature can modify their powers at discretion, *Wales* v. *Belcher*, 3 Pick. 508 ; that the legis-ature having delegated an authority without an interest to the county commissioners, might themselves do any act, which they had authorized the county commissioners to do, *Rice* v. *Parkman*, 16 Mass. R. 326 ; that the power of the county commissioners, to lay out a highway over the en-closure, was superseded by its previous appropriation to a distinct public use by the legislature, *Commonwealth* v. *Coombs*, 2 Mass. R. 489 ; *Hood* v. *Proprietors of Dighton Bridge*, 3 Mass. R. 267 ; *West Boston Bridge* v. *County Commission-ers of Middlesex*, 10 Pick. 270 ; *Joy* v. *County of Oxford*, 3 Greenl. 131 ; that the petitioners had no vested right in the subject matter of their petition, and therefore were not en-titled to the remedy which they had applied for, 6 Dane's Abr. 320 ; *Springfield* v. *Hampden Commissioners of High-ways*, 6 Pick. 508 ; *Rex* v. *Benchers of Lincoln's Inn*, 4 Barn. & Cressw. 855 ; *Rex* v. *Archbishop of Canterbury*, 15 East, 136 ; *The People* v. *Supervisors of Albany*, 12 Johns. R. 415 ; *Commonwealth* v. *Rosseter*, 2 Binney, 362 ; *Case of the Lecturer of St. Anne's, Westminster*, 2 Strange, 1192 ; *Rex* v. *Blooer*, 2 Burr. 1043 ; *Rex* v. *The Borough of Mid-hurst*, 1 Wils. 283 ; *Rex* v. *Justices of Kent*, 14 East, 395 ; *Rex* v. *The Archbishop of Canterbury*, 8 East, 213 ; *United States* v *Lawrence*, 3 Dallas, 42 ; *Chase* v. *The Blackstone*

*Canal Co.* 10 Pick. 244 ; *Rex* v. *The Merchant Tailors' Co.* 2 Barn. & Adol. 115 ; 3 Dane's Abr. 263 ; *Commonwealth* v. *Sessions of Middlesex,* 9 Mass. R. 388 ; *Waldron* v. *Lee,* 5 Pick. 323 ; *Springfield* v. *Commissioners of Highways of Hampden,* 4 Pick. 68 ; *Springfield* v. *County Commissioners of Hampden,* 10 Pick. 59 ; *Mendon* v. *County of Worcester,* 10 Pick. 235 ; 1 New York Revised Laws, 367, 386, 513, 514 ; *Hull* v. *Supervisors of Oneida,* 19 Johns. R. 259 ; *Wilson* v. *Supervisors of Albany,* 12 Johns. R. 416 ; *West Boston Bridge* v. *County Commissioners of Middlesex,* 10 Pick. 272 ; and that if the act authorizing the enclosure of the common were unconstitutional, still this application was an application to the discretion of the Court and that a mandamus would not be granted in a doubtful case, *The King* v. *The Commissioners of Excise,* 2 T. R. 385 ; *Howard* v. *Gage,* 6 Mass. R. 462 ; *Commonwealth* v. *Sessions of Norfolk,* 5 Mass. R. 435.

SHAW C. J. delivered the opinion of the Court. In considering the question, whether the act passed June 5, 1830, providing for the enclosure and appropriation of Cambridge common is a constitutional act, having the force and effect of law, the delicacy and importance of the subject may render it not improper to repeat what has been so often suggested by courts of justice, that when called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. Still however it cannot be doubted, and I believe it is nowhere denied, that in a limited government like ours, acting under a written constitution with numerous and detailed provisions, a constitution which is in itself perpetual and irrepealable except by the people themselves, and which imposes many restraints upon the power of the legislature by express provisions and many others by necessary implication, and where the same constitution has provided for the establish-

Wellington
*et al.*
Petitioners
&c.

Oct. 14th
1834.

ment of a judiciary as a coördinate department of the government, with power in all cases to expound the laws, to declare what has and what has not the force of law, and to apply them to the investigation and adjustment of the rights, duties, and obligations of citizens, in the actual administration of justice, it is clearly within the power, and sometimes the imperative duty of courts, to declare that a particular enactment is not warranted by the power vested in the legislature, and therefore to the extent, to which it thus exceeds the power of the legislature, it is without efficacy, inoperative, and void. Perhaps, however, it may be well doubted, whether a formal act of legislation can ever with strict legal propriety be said to be void ; it seems more consistent with the nature of the subject, and the principles applicable to analogous cases, to treat it as voidable. But whether or not a case can be imagined, in which an act of the legislature can be deemed absolutely void, we think it quite clear, that when such act is alleged to be void, on the ground that it exceeds the just limits of legislative power, and thus injuriously affects the rights of others, it is to be deemed void only in respect to those particulars, and as against those persons, whose rights are thus affected. *Primâ facie*, and upon the face of the act itself, nothing will generally appear to show that the act is not valid ; and it is only when some person attempts to resist its operation and calls in the aid of the judicial power, to pronounce it void, as to him, his property, or his rights, that the objection of unconstitutionality can be presented and sustained. Respect for the legislature, therefore, concurs with well established principles of law, in the conclusion, that such act is not void, but voidable only ; and it follows as a necessary legal inference from this position, that this ground of avoidance can be taken advantage of, by those only who have a right to question the validity of the act, and not by strangers. To this extent only is it necessary to go, in order to secure and protect the rights of all persons, against the unwarranted exercise of legislative power, and to this extent only, therefore, are courts of justice called on to interpose.

Besides, and this is another argument leading to the same result, if a legislative act may or may not be valid according

to circumstances, courts are bound by the plainest principles of exposition, as well as by a just deference to the legislature, to presume the existence of those circumstances which will support it and give it validity. For instance, if an act of the legislature appears on the face of it to be an encroachment on the rights of any persons, but would nevertheless be valid if passed with the consent of those persons, the court is bound to presume that such consent was given. And this presumption must prevail in favor of the validity of the act, until the contrary is shown, and shown too by a person having an interest in the maintenance of the rights supposed to be thus injuriously affected, and having a right to call for the interposition of the court for their support and protection, and a stranger can have no right to appear and contest the validity of the act upon such a ground.

Several objections have been taken to the constitutionality of this act, which deserve consideration.

1. The first is, that the commonwealth did not own tne soil, and that the legislature had no authority to appropriate the land to public use, without the express consent of tne owners ; and if such consent is not given, the act is of itself illegal and void. This objection, we think, cannot be sustained ; the consent of the owners in such case may be subsequent as well as previous, presumed and tacit, as well as express and proved by some positive act. But whether so or not, the objection cannot be taken by a stranger who has and claims no title or interest in the soil. It may often happen in a newly settled township or other place, that a qualified appropriation of a portion of the property to certain specified public uses, with a provision for its embellishment and improvement, will enhance the value of the property and confer a great benefit on the owner, a benefit so obvious, that the legislature may think it quite superfluous to wait for the owner's consent. Shall not his assent be presumed ? Can a stranger treat the act as a nullity and destroy the improvement ? It is said, that if this act can be sustained, the legislature might appropriate all the property in the town of Cambridge to public use. Suppose it were so. If the legislature were to provide for laying out walks over all the farms in Cambridge, for levelling, im-

proving, and embellishing such walks, and all the owners of those farms should acquiesce, I know no principle which should authorize a stranger to interfere and treat the law providing for the making and for the protection of these improvements as a nullity.

But it is contended, that if this act is to depend for its validity upon the consent of the town of Cambridge, then such consent must be deemed equivalent to a positive act of the town, appropriating the land to the same uses declared by the act of the legislature, that this would be a breach of the condition of the grant under which the town holds it, and the proprietors of common and undivided lands might enter for condition broken, revest the title in themselves, and thus having become owners, would be in a condition to contest the validity of the act and resist its operation. Although it is obvious to remark, that this looks to many contingencies and that it is time enough to discuss this question when it is raised by the proprietors, it may tend to a more satisfactory elucidation of the general question, to give it a passing consideration. The vote of the proprietors in 1769 designates the land as the town commons, and it is probable from the buildings around it, that it had remained open for public use, from the first settlement of the town. By the terms of the grant, this land is to be used as a training field, to lie undivided, and to remain for that use for ever. To take these clauses separate lv. It is insisted, that the act of the legislature and the proceedings of the special commissioners under it are contrary to this condition, because the common is thereby *divided* into several distinct enclosures. We think this implies a misapplication of the term. When this term *undivided* is used and applied to lands by proprietors of common and undivided lands, it implies land set apart from their general domain, and not subject to partition, and not to be divided, set off and allotted to individual proprietors, to hold in severalty. The substance of the provision is, that it is to remain common and public.

As to the other branch of this condition, that it is to be used as a training field, and declaring a forfeiture, if the town should dispose of, grant or appropriate the same to any other

use, it is to be considered what the effect of this condition is, Wellington and whether, had the town done the same acts, and made the same improvements, contemplated by the act of the legislature, it would have been a breach of this condition.

By the grant the town became owners of the soil with full power, as such owners, to make any use of the property, which owners of land can make, subject only to the restraint and limitation expressed in the condition. All such limitations and restrictions, especially those which go to create a forfeiture, are to be construed strictly, and not to be extended beyond the plain terms of the clauses in which they are expressed, and the obvious purposes for which they are introduced. Any other construction would impose a useless embarrassment upon the rights of property in the grantee, without benefit to the grantor. It appears to us, construing this grant according to these rules, that the intent of the restriction and condition in this deed was, that the land should remain common and open, in contradistinction to being divided to be held in severalty, and appropriated to private use, and that no disposition or appropriation should be made of it, inconsistent with its use as a training field. To what various uses, not incompatible with these purposes, the town as owners might appropriate it, it is not necessary here to inquire ; it is sufficient for all the purposes of this view of the subject, if the use contemplated by the act of the legislature, is not inconsistent with those expressed in the condition of the grant from the proprietors to the town. And we think upon the best consideration we have been able to give the subject, that the use contemplated, is not inconsistent with those in the condition, and perhaps it is not saying too much to add, that they are in furtherance and promotion of the same object. It is declared by the act to be forever appropriated to public use only, as a public park, promenade, and place for military parade, with a strong negative clause, for greater caution, that no part thereof shall on any pretence be appropriated to any purpose of private use or emolument. Nor are any of the powers conferred on the persons named in the act, nor the acts which they are authorized to do, such as will render the place unfit for the purposes of military parade. They are

authorized to enclose the grounds with a fence, to level the surface, to plant trees, to lay out and make walks, all being done with the approbation of the selectmen of the town, leaving suitable and convenient avenues for persons passing on foot. All these improvements would rather increase than diminish the fitness and convenience of the place, as a military parade ; and if required to be opened for the evolutions of artillery or cavalry, the provision in the act appropriating it generally to public use as a place of military parade, would be a sufficient authority for so using it.

As to the general principle above stated, that the terms of the condition do not restrain the town from such a use of the property, as will be perfectly consistent with the use contemplated by the condition of the grant, and even promotive of its general object, it may serve as an illustration to inquire, whether a highway or town road over the land would be a breach of the condition and cause of forfeiture. Roads are not only not incompatible with the purposes of military parade, but are necessary to military operations. Suppose the town had laid out a town way, or petitioned the proper authorities to lay out a highway over this common, could it be contended that this was appropriating it to a purpose other than that of keeping it undivided and appropriating it for a place of military parade ? If this were so, the laying out of the Cambridge and Concord Turnpike, the subsequent laying out of a highway by the commissioners, the loss of which these petitioners so much lament, supposing it done, as it probably was, with the consent of the town, was a breach of condition and forfeiture of the land ; nay, the very act which the petitioners are now urging the commissioners to do, if done with the consent of the town, which must be presumed, where the considerations of common convenience and necessity are so obvious and urgent as the petitioners represent them, would subject the town to a forfeiture.

On the whole, on this part of the case, we are of opinion, that the condition in this grant of the proprietors to the town, does not restrain them or expose them to any forfeiture, by consenting to the improvements and appropriations contemplated by the act of June 1830, because they are in no degree

inconsistent with the purposes and appropriations, declared in the grant, but rather tend to promote, confirm, and perpetuate the use and appropriation therein contemplated.

2. It is objected, that there was no adjudication that the laying out of Cambridge common, and the enclosure thereof, were of common convenience and necessity. But the legislature are bound to no particular form. Representing the sovereign authority of the Commonwealth, if the act done is within the scope of their authority, the mode of doing it is optional, and it is sufficient if done in any mode that is intelligible. The act itself is sufficient evidence of the opinion and judgment of the legislature, that the public use contemplated would be of public convenience.

3. It is objected, that no provision is made in the act for compensation to parties aggrieved for damage done to private property. If there were any force in this objection, in a case where such an act could affect private property, it can have no effect here, because it contemplated no property not already appropriated to public use, it was exclusively the property of the town of Cambridge, and was calculated to enhance the benefit, instead of injuriously affecting the property.

4. Another objection was, that nobody is charged with the duty of keeping this common or the roads around it in repair. This objection, we think, is not sustained in point of fact as to the roads. The special commissioners were authorized to make alterations in the roads by which the common was then traversed ; that is, they were empowered to discontinue some roads and lay out others, regard being had to the common convenience and necessity. When they had executed this authority and made their return as they did, the roads by them laid out as a substitute for those which crossed the enclosure, became lawful public highways, and the town became liable to the duty of supporting them as such. As to the other branch of the objection, that no provision is made for the preservation and support of the improvements when made, this may be a defect in the act, but cannot affect its validity or constitutionality.

5. Another objection taken and somewhat relied on, was, that the legislature had no power to declare that any portion

of territory should be *forever* appropriated to any one public use, because it had a tendency to encroach upon the acknowledged sovereign power of the State, in case of emergency, to take any property, public or private, which the exigencies of the country might require. We think there is no weight in this objection. Nothing in this act supersedes, or has a tendency to supersede, that sovereign power over all property, inherent in all governments, sometimes called the right of *eminent domain*, the power of taking property for public use, as the exigencies of the country may require. All acts of legislation not in terms limited in their operation to a particular term of time, are in legal contemplation perpetual or declared to be in force *forever;* which means, until duly altered or changed by competent authority.

Upon a consideration of all the objections, we are of opinion, that the act of June 1830, did not exceed the just limits of legislative power, and is not unconstitutional. We have considered this question, because it was freely discussed in the very able argument in this cause ; and yet it cannot escape observation, that if this act was unconstitutional, and as contended, absolutely null and void, then all acts done under it are void, the highways over this common have not been legally discontinued, there is already a highway on the precise place where the petitioners now pray to have one laid out, and therefore any act of the commissioners laying out a highway as prayed for, would be wholly nugatory and inoperative.

The other material question presented is, supposing the act in question to be valid and to have the force of law, whether it does by its operation supersede the jurisdiction of the county commissioners and take away their power to lay out a common highway over the common thus appropriated in a qualified manner to public uses. There is no doubt, we think, of the power of the legislature to make provision for the appropriation of any territory to any special use, and thereby to provide that the power of the commissioners to lay a highway over it, being inconsistent with the particular use, shall be suspended or superseded. The subject of highways, bridges, canals, and other public works, for facilitating communication between one part of the territory of a State and

another, are peculiarly within the province of the sovereign power of the State, represented and exercised by the legislature. In the cases of more frequent recurrence, as those of roads and ferries, it has been the practice of the legislature of this Commonwealth to provide for the establishment of this common class of public easements, by delegating the power to some properly constituted body. But in the more rare and often the more important and interesting cases, as those of bridges over navigable waters, canals, and more recently railroads, the legislature has exercised the power in each particular case, as also in that large class of the most important highways, turnpikes, the expense of which is borne by individuals in the first instance and repaid by tolls. There seems to be no objection in principle to the exercise of this authority on the part of the legislature ; and there are many cases in the books, in which it has been held to be valid. And in cases of navigable rivers, in which the public have an easement of a more general nature, it is held that the court of sessions, and county commissioners, have no authority to lay out a highway, because inconsistent with the more general public use, to which it is appropriated. *Commonwealth* v. *Coombs*, 2 Mass. R. 492 ; *Arundel* v. *M'Culloch*, 10 Mass. R. 70 ; *Commonwealth* v. *Charlestown*, 1 Pick. 180. Without going into all the authorities, the result is, that the county commissioners exercise a qualified, limited general authority, to lay out and alter highways, and discontinue them, but that this does not supersede the authority of the legislature, and that whenever the legislature, in the exercise of its powers, has annexed the character of public use to any property, and this public use thus declared, would be destroyed or interrupted by the laying out of a highway, the power of the county commissioners to lay out a highway is superseded.

It is manifest, that in cases of rare occurrence, as that of a railroad, or other similar work, if property could not be appropriated to public use by the legislature, it could not be done at all, because there is no provision by law for its being done in any other way. The right of the sovereign power of the State is incontestable. No other provision being made for its exercise, it is therefore necessarily vested in the legis-

lature.   Such is the present case, that of a public park, promenade, and place for military parade.   Cases may be supposed, in which the exercise of the power would be important, not only to the convenience and comfort, but to .he security and military defence of the inhabitants ; but this power must be exercised by the legislature, either in each particular instance, or by general law, or must lie dormant.

Considering the power of the legislature undeniable, the question is, whether the act by its terms and provisions does supersede the power of the county commissioners to lay out a highway over this common ; and this depends upon another, namely, whether the obvious public use and purpose, to which this area is appropriated by the act, would be defeated, destroyed, or greatly diminished and impaired, by laying a highway over it.   To determine this question we must examine the act, to ascertain what the use and purpose were, which were intended to be secured and made perpetual by the act The leading object and purpose of the act was to provide for the *enclosing* of such parts of the common, as the commissioners should determine.   It must of course be understood, *enclosing* by a fence.   The second ·section provides, that the said *enclosure* shall be forever kept appropriated to public use only, as a public park, &c.   The third section inflicts penalties upon all persons who shall maliciously injure or destroy the *fences*, &c.   The act empowers the commissioners to make alterations in the direction of all roads, by which the common is traversed, and it requires convenient avenues to be left, for the accommodation of persons who may have occasion to enter or pass over any part of the enclosure on foot. It seems to the Court very clear from these provisions, and from the whole tenor of the act, including the title, that it was the intention of the legislature by this act to appropriate this ground to public use, as an enclosed foot walk, securing to al. the citizens a general right of way as foot passengers, and necessarily excluding the general travel of a highway, by horses,· carriages, and teams.   If such be the natural, the necessary and legal construction of the act, it is to have tne same effect as if negative words had been used, and  i had been declared that it should not be used for the general

purposes of a highway. We think, therefore, that the rule applies to this case, that where the legislature have appropriated any territory to a specific public use, and the laying a highway over it would be inconsistent with such public use, and contrary to the terms and provisions of such appropriation, the general power of the county commissioners to lay out highways, so far as such appropriated territory is concerned, is suspended and superseded.

It appears to us that this decision does not involve the sovereign right of eminent domain, or affect the power of the 'egislature to appropriate this property to other public uses, as public exigencies may arise. The sole question is, whether it supersedes the ordinary power and action of the county commissioners, and we are of opinion, for the reason already stated, that it does, and that the decision of the commissioners, refusing to inquire into the question whether a highway in the place proposed, was of common convenience and necessity, and dismissing the petition, was correct.

One other question was raised and somewhat discussed in the argument, whether the petitioners in the present case stand in such a relation to the cause and the subject matter, as to warrant them in applying to this Court for a writ of mandamus. It was contended by the respondents, that they do not, and that the petition ought to be dismissed upon that ground.

Undoubtedly the general rule is, that a private individual can apply for a writ of mandamus only in a case where he has some private or particular interest to be subserved, or some particular right to be pursued or protected by the aid of this process, independent of that which he holds in common with the public at large ; and it is for the public officers exclusively to apply, where public rights are to be subserved. *Rex v. Merchant Tailors' Co.*, 2 Barn. & Ald. 115.

But, although the proceedings before the county commissioners now, and before the Court of Sessions formerly, for obtaining the laying out of a highway, are in some measure public proceedings, inasmuch as the ultimate object is to acquire an easement for the public, yet by the course of the proceeding as presented and regulated by statute, it assumes in some degree the form of a private adversary suit. The foundation

VOL. XVI. 8

*(margin note:)* Wellington *et al.* Petitioners &c.

of the proceeding is a petition to the county commissioners by individuals, praying for the laying out of a new highway, or the alteration or discontinuance of an old one, 'n a course designated by a description sufficiently particular to indicate it to all parties interested. Without such a petition, they have no jurisdiction, nor have they power to go beyond the matter prayed for, as by laying out a new road where the petition was for an alteration. In some cases the petitioners are required to give security, and in some cases they are liable for costs. From these views of this somewhat anomalous proceeding, it may perhaps be urged with some force, that petitioners so situated are parties and as such have an interest in the final and correct determination of the cause, and a right to have the suit brought to its regular and proper termination ; and that if obstacles intervene and questions of law arise, in the course of such cause, they have such a vested or actual interest, as will entitle them to obtain a writ of mandamus, when that is the regular and proper process to enable them to bring the suit to a legal and correct termination. But from the view which we have taken of the merits of this subject, it has become unnecessary to decide this question, and therefore we give no opinion upon it.

*Petition dismissed.*