## WILLIAM ST. GEORGE v. FRANK P. HARDIE.

(Filed 11 March, 1908).

1. Pilots—Appointment—Existing Office—Constitutional Law.

The acts of the board of commissioners under chapter 625, Public Laws of 1907, regulating pilotage, fees, etc., are not invalid for reason that the statute directs the Governor to appoint them "on or before the 5th day of April, 1907," prescribes that the term of office shall begin 15 April, and the commissions were issued on 13 March, when it appears from the language of the statute that the office of commissioner had been created before the time of the appointment. (*Cook v. Meares*, 116 N. C., 582; *State v. Shuford*, 128 N. C., 588, cited and distinguished).

2. Same—Collateral Attack.

When an office has been duly constituted by statute and the person therefor has duly qualified, his appointment, upon the ground that it was not made when the statute directed, though otherwise valid, cannot be collaterally attacked.

3. Pilots—Services Tendered—Fees—Constitutional Law.

The State has a right, looking to the safety of persons and property, to regulate pilotage, and to provide for the payment to the pilot, under given conditions, of the same fee for services tendered and refused as he would have earned had the service been accepted and performed.

4. Pilots—Statutory Regulation—Interpretation—Maritime Law.

The statutes respecting pilotage are not in derogation of a common-law right, but a part of the maritime law, or the law of nations, and should be liberally construed.

5. Pilots—Selection by Commission—Privileges and Monopolies—Constitutional Law.

The selection by a commission of persons qualified to act as pilots is not violative of Art. I, secs. 7 and 31, of the State Constitution, prohibiting exclusive emoluments or privileges and monopolies.

St. George *v.* Hardie.

6. Pilots—Theretofore Commissioned, Continued—No Examination—
Constitutional Law.

The provisions of chapter 625, Public Laws 1907, regulating the
appointment of pilots, and, among other things, providing, in
effect, that those theretofore commissioned should be continued
as such and need not be examined, etc., is constitutional and valid.

7. Pilots—Statutory Regulation—Constitutional Law—No Rights De-
nied.

The defendant cannot set up as a defense to the payment of
pilot's fees, sued for by plaintiff, that the statute limiting the
number of pilots is unconstitutional, when no right of his is de-
nied and he merely seeks to avoid the payment of such fees to
anyone.

8. Same—Appeal and Error.

When there is no provision in the statute for staying execution
on appeal from a court of competent jurisdiction—in this case a
justice of the peace—it is doubtful whether, under our present
constitutional judicial system, the act is constitutional; but when
it appears that the stay bond was actually given, the Supreme
Court will not dismiss the suit, as no right of the defendant has
been denied.

9. Statutes—Construction—Federal Constitution—Federal Powers—
Silence of Congress—State Legislation.

The construction of a statute should be such as would give it
validity respecting such of its subject-matters relegated to the
Federal Government as are not prohibited by the Federal Consti-
tution and laws; and when Congress has been silent on some mat-
ters of which the Federal Constitution has given it jurisdiction,
but not on others, a legislative enactment upon all such matters
will be construed to mean all such as to which congressional legis-
lation is silent.

10. Same—Pilots.

When the Federal statute provides that nothing therein "shall
be construed to annul or affect any regulation established by the
law of any State requiring vessels entering or leaving port of
any such State * * * to take a pilot licensed or authorized
by the laws of such State," etc., it is a recognition of the rights of
a State to regulate pilots upon matters concerning which con-
gressional legislation is silent, and as to such it is not prohibited
by the Federal Constitution.

11. Pilots — Regulations as to Weather Conditions — Constitutional Law.

> Section 15, chapter 625, Public Laws 1907, providing that vessels are not subject to pay pilotage inward from sea under certain weather conditions, is valid, when construed with the other sections of said chapter, being an incentive to render pilots vigilant.

CIVIL ACTION, heard on appeal from a judgment of a justice of the peace, before *Biggs, J.,* at July Term, 1907, of the Superior Court of NEW HANOVER County.

Plaintiff sues defendant, master of schooner *H. E. Thompson,* for recovery of pilotage fees, pursuant to provisions of chapter 625, Public Laws 1907. The pleadings and admissions of record disclose this case:

The General Assembly, at its session of 1907 (chapter 625, Public Laws), enacted a statute regulating pilotage in the Cape Fear River, etc. Pursuant to section 1, the Governor, on 13 March, 1907, commissioned five persons to constitute the Board of Navigation, etc. Plaintiff, being duly qualified therefor, was, on 18 May, 1907, granted a license by the board as a full pilot for vessels going in and out of the Cape Fear River, and filed his bond as required by law. On 29 May, 1907, while in the discharge of the duties of his office, he spoke the schooner *H. E. Thompson,* a sailing vessel of more than sixty-eight tons, from Boston, then running in for said bar, and offered to serve defendant, master of said vessel, as pilot over the bar to Southport. Plaintiff was the first pilot to speak said vessel. Defendant declined to accept plaintiff as pilot, and went over the bar and into the river without a pilot. On 15 June, 1907, learning the said schooner would sail the following day, plaintiff offered himself to pilot the vessel over the bar going out to sea, but was refused by defendant. At the time of offering to pilot said vessel over the bar, into and out of the river, plaintiff was ready, able and willing to serve said vessel as pilot. Said schooner drew 16½ feet of water. On both said days the weather was fair. There were at said time thirty-four pilots authorized to re-

ceive license and acting under the act of 1907.     The amount of pilot fees fixed for said vessel by the provisions of the statute is $70.22, which plaintiff duly demanded of defendant, payment whereof was refused.

The action originated in a justice's court, and came by appeal to the Superior Court of New Hanover County. Judgment was rendered for plaintiff.     Defendant excepted and appealed.     The assignments of error are set out in the opinion.

*E. S. Martin* and *Rountree & Carr* for plaintiff.
*Preston Cumming, Jr.,* and *Russell & Goodman* for defendant.

CONNOR, J., after stating the case: Plaintiff's cause of action is based upon the provisions of chapter 625, Public Laws 1907, entitled "An act to protect and promote the commerce of the port of Wilmington and the State of North Carolina," ratified 6 March, 1907.

The statute creates a Board of Commissioners of Navigation of the Cape Fear River, consisting of five persons, to be appointed by the Governor on or before the fifth day of April, 1907, and on the same day every four years thereafter, the term of their office to begin on the 15th day of April, 1907. This board is required and empowered to make rules and regulations in regard to pilots, for the purpose of compelling them to be on duty, etc., to examine such persons as may offer themselves to be pilots for the Cape Fear River and bar, and to give to such as are approved and found qualified branches or licenses.     Such persons as were qualified to serve as pilots prior to 1 January, 1905, are to receive branches without examination: *"Provided,* that no new branches shall be given until after the number of pilots commissioned shall have been reduced, by death, resignation or otherwise, to the number of twenty, and there shall not be at any time thereafter a greater number than twenty nor a less number than fifteen commis-

sioned by the board." Two classes of branches are to be issued, and to be renewed annually, with power of renewal by the board.

Section 13 provides that "All vessels, coastwise or foreign, over sixty gross tons * * * shall take a State-licensed pilot from sea to Southport and from Southport to sea." Rates of fees are fixed by this section. The first pilot speaking a vessel shall be entitled to the pilotage fees over the bar to Southport and out to sea again, provided said pilot shall be ready and willing to serve as a pilot, etc. Other sections are referred to in defendant's assignments of error, which will be set out when we discuss the phases of the case applying to them.

The first assignment is directed to the finding that the Governor issued the commissions to the members of the Board of Commissioners on 13 March, 1907, whereas the statute directs that the term of office shall not begin until 15 April, 1907, and that the Governor is directed to appoint "on or before the 5th day of April, 1907." Defendant cites *Cook v. Meares,* 116 N. C., 582, to sustain this exception. In that case the Legislature elected the relator to an office not then in existence, but created by an act which was not ratified at the time of the election. Hence, as the court held, no such office had been created at the time of the election. Here the act creates the office, or, in the language of the statute, "the Board of Commissioners of Navigation is hereby constituted," etc. This was done 6 March, 1907. It is conceded that the commissioners duly qualified on 15 April, 1907, the day upon which their term commenced. If they had not been appointed prior to 15 April, it would hardly be contended that the date of their appointment was so essential that an appointment could not have been made after 15 April, 1907. The office existed without regard to the appointment. The purpose of the Legislature was to constitute a Board of Commissioners of Navigation, the term of office beginning 15 April, 1907. The

time of making the appointment is merely directory. The power to act, to discharge the duties of the office, is derived from the qualification, which was in strict accordance with the statute.

In *State v. Shuford,* 128 N. C., 588, the statute creating the district expressly provided that it should go into effect 30 June, 1901. The appointment was made before that day, and the Judge was discharging the duties of the office prior thereto. As said by *Clark, J.,* "There can, therefore, be no Sixteenth District till 30 June, and consequently until that date there can be no such office as Judge of the Sixteenth District." The distinction between the cases is obvious. Again, an office having been duly constituted and the commissioners being duly qualified, they become, in any point of view, *de facto* officers. An appointment made by them pursuant to the duty prescribed by law cannot be drawn into question collaterally. It would seem that, even upon a *quo warranto* proceeding, the appointment by a *de facto* officer is valid. *Norfleet v. Staton,* 73 N. C., 546.

The learned counsel for defendant frankly concede the power of the State to regulate pilotage. We find, upon examining the statutes cited in the brief of plaintiff's counsel, that, prior to its separation from England and at all times since, statutes have been enacted by the Legislature of this State regulating pilotage, providing for licensing and requiring vessels entering the ports to use them, prescribing their fees, etc. Acts 1786, ch. 27. The same is true of other States—in fact, of all nations having seaports. In *Cooley v. Board of Wardens,* 12 How., 299, several of the objections made to this statute were pressed upon the Court. Counsel, in exhaustive briefs sustaining the power, cite statutes of many of the States, including our own, showing that the States have asserted and exercised the power to regulate pilotage. *Judge Curtis,* in a learned and exhaustive opinion, says: "We think this particular regulation concerning half

pilotage fees is an appropriate part of a general system of regulation of this subject. Testing it by the practice of commercial States and countries legislating on this subject, we find it has usually been deemed necessary to make similar provisions. Numerous laws of this kind are cited in the learned arguments of the counsel for the defendant in error, and their fitness as a part of a system of pilotage in many places may be inferred from their existence in so many different States and countries. Like other laws, they are framed to meet the most usual cases, *quæ frequentius accidunt;* they rest upon the propriety of securing lives and property exposed to the perils of a dangerous navigation by taking on board a person peculiarly skilled to encounter or avoid them, upon the policy of discouraging the commanders of vessels from refusing to receive such persons on board at the proper times and places, and upon the expediency and even intrinsic justice of not suffering those who have incurred labor and expense and danger to place themselves in a position to render important service, generally necessary, to go unrewarded because a particular vessel either rashly refuses their proffered assistance or, contrary to the general experience, does not need it. There are many cases in which an offer to perform is deemed by law equivalent to performance. The laws of commercial States and countries have made an offer of pilotage service one of these cases, and we cannot pronounce a law which does this to be so far removed from the usual and fit scope of laws for the regulation of pilots and pilotage as to be denied, for this cause, as a covert attempt to legislate upon another subject under the appearance of legislating upon this one." This language was quoted with approval by *Simonton, Circuit Judge,* in *The Carrie L. Tyler,* 106 Fed. Rep., 422. He also says: "Nor can any objection be made to the provision of the law giving a pilot the same fees for services tendered and refused as he would have earned if the service had been accepted and performed." This case involved a construction

of the pilotage law of this State. The Code (1883), Vol. II, ch. 46, is in many respects the same as the act of 1907 and the act of 1786, ch. 27. *Cooley v. Wardens, supra,* has been uniformly approved, and the law as therein laid down has been regarded as "long since settled." *Olsen v. Smith,* 195 U. S., 332. The defendant insists that, conceding this to be true, the statute contains provisions which violate the State and Federal Constitutions. It may be well to note the rule prescribed by a Court distinguished for learning regarding the principle upon which statutes of this character should be construed. In *Smith v. Swift,* 49 Mass., 329, it is said, in reply to the suggestion that they should be strictly construed: "We think this is a mistaken view of the subject. The laws respecting pilotage are not in derogation or contravention of common-law rights. They are not, in our opinion, connected with nor do they proceed from the common law. They are rather to be classed under the head of the maritime law, which is not the particular law of England, but a part of the law of nations. This subordinate but highly useful branch of the marine law, regulating pilots and pilotage, has long been enforced by positive statute provisions; and, from the very nature of the subject, these provisions are entitled to a liberal construction, in order to give full efficiency to laws especially designed to promote the interests of commerce and to protect the lives and property of citizens engaged in it."

Defendant insists that the statute creates a monopoly and thereby violates Article I, sections 7 and 31, of our Constitution, declaring "That no man or set of men are entitled to exclusive or separate emoluments or privileges," etc., and "That perpetuities and monopolies are contrary to the genius of a free State," etc. When it is conceded or established that the State has the right, under its police power, to prescribe the duties, fix the fees and otherwise regulate pilots and pilotage, it would seem to follow logically that it has the power to prescribe the qualifications and establish methods of examin-

ing and licensing those who engage in the service. · Whenever it is shown that pilotage is subject to governmental control and the pilot is a *quasi* public officer, the power and duty of the Legislature to prescribe rules for ascertaining and declaring who are competent, by reason of age, character, skill, experience, etc., follow. The power comes within the principle upon which the State prescribes the qualifications of those who are admitted to practice law, medicine, dentistry and other callings and professions so related to the public. This Court, following the uniform current of thought, has sustained the legislation applied to physicians. *State v. Van Doran,* 109 N. C., 864; *State v. Call,* 121 N. C., 643, wherein *Clark, J.,* says: "It is not to be questioned that the lawmaking power has the right to require an examination and certificate as to the competency of persons desiring to practice law or medicine, to teach, to be druggists, *pilots,* engineers, or to exercise other callings, whether skilled trades or professions, affecting the public, and which require skill and efficiency. To require this is an exercise of the police power for the protection of the public against incompetents and impostors, and is in no sense the creation of a monopoly or special privileges." In that case the statute exempts physicians who had been engaged in practice prior to a period fixed by the act. The objection was urged that it discriminated against all others and granted a special privilege to the excepted class. This objection was held invalid. *State v. Hicks,* 143 N. C., 689. This contention, in connection with the next in order, that the statute violates the Fourteenth Amendment to the Constitution, is disposed of by the opinion of *Mr. Justice White,* in *Olsen v. Smith, supra* (p. 344), wherein he says: "It only remains to consider the contention based upon the Fourteenth Amendment and the anti-trust laws of Congress. The argument is that the right of a person who is competent to perform pilotage services to render them is an inherent right guaranteed by the Fourteenth Amendment. But this propo-

sition, in its essence, simply denies that pilotage is subject
to governmental control, and, therefore, is foreclosed by the
adjudications to which we have previously referred.    The
contention that, because commissioned pilots have a monopoly
of the business- and by combination among themselves exclude
all others from rendering pilotage services, is also but a denial
of the authority of the State to regulate, since, if the State
has the power to regulate, and, in doing so, to appoint and
commission those who are to perform pilotage services, it
must follow that no monopoly or combination, in a legal sense,
can arise from the fact that the duly authorized agents of the
State are alone allowed to perform the duties devolving upon
them by law."    22 Am. and Eng. Enc., 816.

There is, however, another view by which this and two
other exceptions may be disposed of.    If it were conceded
that the power of the State to limit the number of persons
otherwise competent to serve as pilots was open to serious con-
troversy by reason of the principle urged by defendant and
illustrated in the case of *State v. Moore,* 113 N. C., 697, how
is it open to defendant to urge this objection to the validity of
the provision of the statute in this respect?    It is not clear
how any constitutional right of his is impaired by limiting the
number of pilots.    He does not lose any right of selection out
of a larger number.    He insists that he does not require any
pilot, and refuses to accept any service whatever from them.
Courts never pass upon the constitutionality of statutes, ex-
cept in cases wherein the party raising the question alleges
that he is deprived of some right guaranteed by the Constitu-
tion, or some burden is imposed upon him in violation of its
protective provisions.    Confusion is sometimes caused by
speaking of an act as unconstitutional in a general sense.
After discussing the duty of courts in this respect, Judge
Cooley says: "Nor will a court listen to an objection made
to the constitutionality of an act by a party whose rights it

147—7

does not affect, and who has, therefore, no interest in defeating it." Const. Lim., 232.   This wise and salutary principle is abundantly sustained by the courts, both State and Federal. *Shaw, C. J.,* in *Willington et al., Petitioners,* 33 Mass., 87 (p. 96), says: "But, whether or not a case can be imagined in which an act of the Legislature can be deemed absolutely void, we think it quite clear that, when such an act is alleged to be void on the ground that it exceeds the just limits of legislative power, and thus injuriously affects the rights of others, it is to be deemed void only in respect to those particulars and as against those persons whose rights are thus affected. * * * It is only where some person attempts to resist its operation and calls in the aid of the judicial power to pronounce it void as to him, his property, his rights, that the objection of unconstitutionality can be presented and sustained."   Only those persons can call the provision limiting the number of pilots to be commissioned into question who assert that some constitutional right of theirs is infringed. In this connection it will be convenient to dispose of the third and fourth assignments of error.

The owners of vessels against whom a judgment is rendered by a justice of the peace are prohibited from staying execution by giving bond pending appeal.   Power is conferred upon the Board of Commissioners of Navigation to hear and determine disputes between pilots and masters of vessels, etc.   We find that these provisions are copied from the statute (chapter 46, The Code of 1883, secs. 3491, 3492), and were enacted as far back as 1802.   It seems that jurisdiction to enforce pilotage regulations was formerly conferred upon admiralty courts.   Doubtless these provisions found their way into our laws from ancient statutes conferring jurisdiction upon these courts.   It is very doubtful whether they can be sustained under our present constitutional judicial system.   For the reasons given in regard to the provision limiting the number of pilots, the question of their validity does not arise upon this

record.   The defendant was permitted to make a deposit in lieu of a bond.   The action was brought before a justice of the peace, whose jurisdiction is conceded; hence, in neither aspect of the case is any right denied defendant by the provisions of the sections referred to.

The defendant assigns as error that his Honor declined to hold that the statute was in contravention of the Constitution of the United States, in that it undertakes to regulate commerce between the States and foreign countries.   This objection was made to a similar statute in *Cooley v. Wardens, etc., supra,* wherein *Judge Curtis* discusses the question and puts it at rest.   That Congress has the power to regulate pilotage is conceded, but it is well settled that this is one of those powers exercised by the States at the adoption of the Constitution, which remained with them until Congress assumed control by legislation.   At its first session Congress did legislate upon certain phases of the subject, providing "That all pilots in the bays, inlets, rivers, harbors and ports of the United States shall continue to be regulated in conformity with the existing laws of the States, respectively, wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress."   Referring to this section, *Judge Curtis* says: "It manifests the understanding of Congress, at the outset of the government, that the nature of this subject is not to require exclusive legislation.   The practice of the States and of the National Government has been in conformity with this declaration from the origin of the National Government to this time; and the nature of the subject, when examined, is such as to leave no doubt of the superior fitness and propriety, not to say the absolute necessity, of different systems of regulation drawn from local knowledge and experience and conformed to local wants. *   *   *   It is the opinion of a majority of the Court that the mere grant to Congress of the power to regulate commerce

did not deprive the States of the power to regulate pilots, and that, although Congress has legislated on this subject, its legislation manifests an intention, with a single exception, not to regulate this subject, but to leave its regulation to the several States." This has been the uniform ruling of the Supreme Court of the United States. *Steamship Co. v. Joliffe,* 49 U. S., 450. The exact question was raised and decided as late as 1904, in *Olsen v. Smith, supra.* It cannot be well said that a State statute regulating pilots and pilotage is unconstitutional; it is a legitimate subject of State regulation until congressional legislation occupies the field, and, in so far as it does so, the State statute does not operate or is suspended. This is illustrated by *Olsen v. Smith, supra.* The State of Texas passed certain pilotage acts containing discriminating provisions. The Supreme Court of Texas held that these provisions were void, but that they were separable from the other provisions, which were valid. The entire statute was attacked in the Supreme Court. *Mr. Justice White* says: "Whether the illegal clauses granting discriminatory exemptions could be eliminated without destroying the other provisions of the State laws regulating pilotage is a State and not a Federal question. For the purpose of determining the validity of the statutes in the Federal aspect, this Court accepts the interpretation given to the statutes by the State court, and tests their validity accordingly." The act in all other respects was sustained. This act provides that all vessels, coastwise or foreign, of "over sixty gross tons," etc. Section 4444, United States Revised Statutes, provides: "No State or municipal government shall impose upon pilots of steam vessels any obligation to procure a State or other license in addition to that issued by the United States, etc. * * * Nothing in this title shall be construed to annul or affect any regulation established by the law of any State requiring vessels entering or leaving a port of any such State, other than coastwise steam vessels, to take a pilot licensed or

authorized by the laws of such State," etc.    Here we find a
clear legislative recognition of the right of the States to regu-
late pilots, except in so far as Congress sees fit to do so.    This
statute is confined to steam coastwise vessels.    Every statute
is to be construed in the light cast upon the language by the
Constitution and other legislation.    Such construction must
be given the language, if possible, that will give it operation
consistent with the Constitution and other statutes.    When,
therefore, the Legislature used the words "all vessels," we
should assume that it did so in the light of the Federal statute
regulating the pilotage of steam vessels, and intended the lan-
guage used to apply only to those vessels in regard to which it
had the power to regulate pilotage.    Thus construed, there can
be no valid criticism of the statute.    It is not only consistent
with the legislative intention, but reconciles the statute with
the Federal statute, preventing any possible confusion.    The
defendant, whose schooner, it is conceded, is not within the
Federal statute, is not injured and has no cause to complain.
Cooley Const. Lim., 252; *Lowery v. Trustees,* 140 N. C., 33.

The last assignment of error involves the construction of
section 15 of the statute: "Any vessel coming into Southport
from sea without the assistance of a pilot, the wind and
weather being such that such assistance could have been rea-
sonably given, shall not be liable for pilotage inward from sea,
and shall be at liberty to depart without payment of any
pilotage, unless the service of a pilot be secured."    The mean-
ing of the Legislature is not so clear as we would wish.    To
give it the construction suggested by defendant would be con-
tradictory of other sections and to a large extent destructive
of the general purpose of the act.    It would seem, read in the
light of other sections and to harmonize with the general pur-
pose of the act, that, if the wind and weather were such that
the assistance of a pilot could have been reasonably given, but
was not offered, the vessel could not only proceed inward, but
could go out without a pilot and without paying any fees, if

she chose so to do.    Thus construed, it is an incentive to pilots to be on the lookout, ready to render assistance, or, upon failure to do so, lose the benefit of the statute.    This is in harmony with the general purpose and scope of the entire statute.

The facts conceded upon this record show that the plaintiff has brought himself within the terms of the act, and, unless the entire statute is to be destroyed, is entitled to recover the fees prescribed.'  ' As we have seen, the sections of which complaint is made, if invalid, do not affect the general scheme which the Legislature has adopted to protect and promote commerce in the Cape Fear River.    The power to do so being conceded, the plaintiff being duly licensed, the defendant's vessel being within the class of vessels subjected to pilotage regulation, the plaintiff having complied with the requirements of the law, his right to recover the fees is in no respect dependent upon the validity of the sections of which complaint is made.    An examination of the recent legislation upon this subject and language found in the briefs indicates that there is a wide divergence of opinion respecting the wisdom of the statute and its effect upon the commerce of the chief commercial city of the State.    These are questions for the consideration of the Legislature.

We have examined the entire record with care, and considered each exception in the light of the well-prepared briefs. It is worthy of note that, although, with the exception of the act of 1905, legislation in all essential respects similar to the act of 1907 is found in our statutes from the earliest period of our history, its validity has not before been called into question, or, at least, has not been before this Court.    As we have seen, the questions discussed upon this record have received careful consideration in other courts, both State and Federal.    In every instance they have been sustained.

We find no error in the record.    It will be so certified.

No Error.