**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-2218

CAPITAL ASSOCIATED INDUSTRIES, INCORPORATED,

Plaintiff − Appellant,

v.

JOSH STEIN, in his official capacity as Attorney General of the State of North Carolina; NANCY LORRIN FREEMAN, In her official capacity as District Attorney for the 10th Prosecutorial District of the State of North Carolina; J. DOUGLAS HENDERSON, In his official capacity as District Attorney for the 18th Prosecutorial District of the State of North Carolina,

Defendants – Appellees,

and

NORTH CAROLINA STATE BAR,

Intervenor/Defendant – Appellee.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Loretta C. Biggs, District Judge. (1:15-cv-00083-LCB-JLW)

Argued: December 13, 2018                    Decided: April 19, 2019

Before GREGORY, Chief Judge, DIAZ, Circuit Judge, and DUNCAN, Senior Circuit Judge.

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Chief Judge Gregory and Senior Judge Duncan joined.

**ARGUED:** Reid Lloyd Phillips, BROOKS, PIERCE, MCLENDON, HUMPHREY, & LEONARD, L.L.P., Greensboro, North Carolina, for Appellant. Alan William Duncan, MULLINS DUNCAN HARRELL & RUSSELL PLLC, Greensboro, North Carolina, for Appellees. **ON BRIEF:** Jennifer K. Van Zant, Charles E. Coble, Craig D. Schauer, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellant. Stephen M. Russell, Jr., MULLINS DUNCAN HARRELL & RUSSELL PLLC, Greensboro, North Carolina, for Appellee North Carolina State Bar. Joshua H. Stein, Attorney General, Matthew W. Sawchak, Solicitor General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees Joshua H. Stein, Nancy Lorrin Freeman, and J. Douglas Henderson.

DIAZ, Circuit Judge:

Capital Associated Industries, Inc. ("CAI") is a trade association representing North Carolina employers. As part of a plan to expand its membership, CAI wants to provide legal services to its members. But it cannot because state law forbids corporations from practicing law. Following unsuccessful lobbying efforts to change the law, CAI sued state prosecutors to enjoin the enforcement of state unauthorized practice of law ("UPL") statutes against it. After the North Carolina State Bar intervened to defend the statutes, the defendants obtained summary judgment. On appeal, CAI contends that North Carolina's UPL statutes violate its constitutional rights to free association, free speech, and commercial speech; lack a rational basis; are void for vagueness; and violate the state constitution. For the reasons that follow, we affirm.

I.

A.

Since 1931, the State of North Carolina has forbidden corporations from practicing law. N.C. Gen Stat. § 84-5(a).[1] To address the unauthorized practice of law, the State Bar and state prosecutors may sue for an injunction, and prosecutors may bring misdemeanor charges. *Id.* §§ 84-37, 84-7, 84-8(a). The UPL statutes do, however, allow

---

[1] North Carolina is not alone in doing so. Almost all other states have similar laws on the books. J.A. 754. One state allows unincorporated nonprofit "association[s]" to practice law. 42 Pa. Cons. Stat. § 2524(b)(1). And CAI points to trade associations practicing law in a few other states. J.A. 181, 197, 213. But at least one of those states bans corporations from practicing law. *See* 705 Ill. Comp. Stat. 220/1.

3

the practice of law by lawyer-owned professional corporations, public interest law firms, and in-house counsel representing their employers. *Id.* §§ 55B-8, 84-5.1.

CAI is a North Carolina nonprofit corporation that claims a tax exemption under 26 U.S.C. § 501(c)(6) as a trade association of employers. It has about 1,100 North Carolina employers as members and describes its mission as fostering successful employment relationships. CAI charges its members an annual fee adjusted for each member's size. It competes with for-profit businesses in providing some services, such as recruiting, background checks, consulting, training, conferences, and affirmative action planning.

One of the most popular services it provides its members is a call center, where members can speak to CAI's staff of human resources experts. The experts can advise on HR issues. But they can't give legal advice, even if they are licensed attorneys. So, when legal issues arise, CAI's HR experts have to steer the conversation elsewhere, end the conversation, or refer the member to outside counsel.

While it disclaims any interest in representing its members in court, CAI would like to help them draft legal documents (such as contracts or employee handbooks) and answer questions about employment and labor law. If it could practice law, CAI would offer most legal services without charge as part of its membership fees, but it would charge hourly fees for certain services.

CAI has spent years trying to change the UPL statutes as part of its "2X" development plan to double its membership and reach. In 2011, CAI's lobbyists persuaded state lawmakers to introduce bills that would have allowed corporations to

4

practice law. CAI tried and failed to get the State Bar to support the bills. The State Bar instead actively opposed the bills, and they were not enacted. CAI's lobbying efforts met a similar fate in 2013. That same year, the State Bar adopted a proposed ethics opinion advising that CAI would violate the UPL statutes if it employed lawyers to give its members legal advice.

B.

After two failed bids to achieve its goals through legislation, CAI turned to the courts. It challenged the UPL statutes in federal district court, naming as defendants the attorney general of North Carolina and certain district attorneys. The complaint sought declaratory and injunctive relief that would prevent enforcement of North Carolina's UPL laws against it. It pleaded five claims under 42 U.S.C. § 1983 (concerning due process, free association, free speech, vagueness, and commercial speech) and one claim under the state constitution.

The district court allowed the State Bar to intervene as a defendant. It then denied CAI's motion for a preliminary injunction and the defendants' motions to dismiss and for judgment on the pleadings. *Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281 (M.D.N.C. 2015); *Capital Associated Indus., Inc. v. Cooper*, No. 1:15CV83, 2016 WL 6775484 (M.D.N.C. June 23, 2016). After discovery, the parties cross-moved for summary judgment.

Before the district court, State Bar representatives expressed concerns about nonlawyers controlling litigation and receiving attorney fees, confidentiality, excessive fees, and the State Bar's inability to discipline corporations. Regarding CAI, they

5

worried about conflicts of interest due to its large base of members and the fact that its directors and officers don't have to be lawyers and thus wouldn't have obligations under the State Bar's Rules of Professional Conduct.

To assuage these concerns, CAI filed declarations from three trade organizations practicing law in other states, and it outlined a plan to comply with ethics rules. CAI's lawyers would control legal services, make decisions about conflicts of interest, and have sole access to privileged communications. But CAI's directors and president would set the attorneys' salaries and the legal department's budget. And CAI declined to offer assurances that it would require its directors and officers to be attorneys.

Some of CAI's members testified that allowing CAI to practice law would mean that they could obtain more efficient and cost-effective legal representation. But almost all those members said they had received legal advice from private attorneys. Just one member said it had gone without counsel in low-risk situations, but even it found counsel for more serious matters. And according to CAI's President and CEO, no member has left CAI because it doesn't offer legal services.

Addressing the cross-motions for summary judgment, the district court first held that CAI had standing because it faced "a credible threat of prosecution" if it practiced law. *Capital Associated Indus., Inc. v. Stein (CAI)*, 283 F. Supp. 3d 374, 380 (M.D.N.C.

6

2017).[2]  The district court then turned to the merits and rejected all six of CAI's claims, entering summary judgment for the defendants.  *Id.* at 383–92.

This appeal followed.

## II.

We review the district court's grant of summary judgment de novo.  *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017).  "[W]e apply the same legal standards as the district court, and view all facts in the light most favorable to the nonmoving party."  *Id.* (quoting *Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017)).

CAI framed all six of its claims as as-applied challenges, which test the constitutionality of a statute applied to the plaintiff based on the record.  *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013).  Thus, CAI was not required to prove that the UPL statutes are invalid in all circumstances.  *Id.*

## III.

---

[2] While the parties' briefs don't address standing, this court must assure itself of its jurisdiction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  We agree with the district court that CAI faces a credible threat of prosecution.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710–11 (4th Cir. 1999).  That injury is traceable to state prosecutors, and enjoining enforcement of the statutes would provide CAI relief.  *CAI*, 283 F. Supp. 3d at 380–81.

We begin with CAI's claim that the UPL statutes violate its freedom of association. CAI contends that it is an expressive association seeking to improve employment relationships in North Carolina and foster compliance with the law.[3] By forbidding it from practicing law, CAI argues, the UPL statutes restrict its ability to carry out that expressive mission. We agree with the district court, however, that the UPL statutes do not unconstitutionally restrict CAI's associational rights.

To support its argument, CAI relies on a line of cases beginning with *NAACP v. Button*, 371 U.S. 415 (1963). In *Button*, the Supreme Court held that a Virginia law forbidding organizations from retaining attorneys to represent third parties infringed on the right of the NAACP and its members "to associate for the purpose of assisting persons who seek legal redress for infringements" of their civil and constitutional rights. *Id.* at 428.

The Court emphasized that for the NAACP, litigation is "not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment." *Id.* at 429. To win civil rights, the Court said, litigation may be the "sole practicable avenue" and the "most effective form of political association." *Id.* at 430–31.

---

[3] The Supreme Court has recognized the right to associate "for the purpose of engaging in those activities protected by the First Amendment," which it termed "expressive association." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). The defendants contend that CAI forfeited review of whether the UPL statutes infringed on its rights as an expressive association. Appellees' Br. at 34–36. CAI did largely omit the term "expressive association" below. But its arguments fall within expressive association jurisprudence and the district court ruled on the issue, so it is preserved for review. *See Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 604 (4th Cir. 2004).

Thus, what was at stake was "secur[ing] constitutionally guaranteed civil rights," not commercial ends. *Id.* at 442–43. And as the Court took time to emphasize, the law as applied against the NAACP did not implicate "professionally reprehensible conflicts of interest." *Id.* at 443.

The Supreme Court has applied *Button* in two contexts. The first, involves public interest organizations like the NAACP. *See In re Primus*, 436 U.S. 412 (1978). In *Primus*, the Court held that South Carolina couldn't forbid the ACLU from advising people of their legal rights and informing them that the ACLU could represent them for free. *Id.* at 431–32. The Court compared the ACLU's role to that of the NAACP in *Button* and contrasted it with "a group that exists for the primary purpose of financial gain." *Id.* at 427–31. It cast doubt on whether an organization operating for financial gain would receive the same protection as organizations that promote the common political aims of their members. *Id.* at 429–30, 437–38, 438 n.32.

The second context involves labor unions. *See Bhd. of R.R. Trainmen v. Va. ex rel. Va. State Bar*, 377 U.S. 1 (1964). The *Trainmen* Court held that Virginia couldn't bar a union from recommending lawyers to its members for workers' compensation suits. *Id.* at 7–8. The Virginia law, the Court said, infringed on "the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest" without adequate justification. *Id.*

The Court has extended *Trainmen* twice. First, it held that Illinois couldn't prevent a union from employing attorneys to represent its members in workers' compensation claims. *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 223–25

9

(1967). While the Court considered that law unjustified, it emphasized that the state did possess an "interest in high standards of legal ethics." *Id.* at 224–25. Second, the Court held that Michigan couldn't bar a union from recommending to its members certain attorneys who had agreed to a maximum fee. *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585–86 (1971). "At issue," the Court said, "is the basic right to group legal action" and the right to "meaningful access to the courts," which required enabling union members to "meet the costs of legal representation." *Id.*

The "common thread running through" these cases is that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right." *United Transp. Union*, 401 U.S. at 585–86; *see also Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1387 (7th Cir. 1992) (*United Mine Workers* "supports the proposition that laypersons have a right to obtain meaningful access to the courts, and to enter into associations with lawyers to effectuate that end."). Critically, however, the cases distinguish between the commercial practice of law and "associating for non-commercial purposes to advocate the enforcement of legal and constitutional rights." *In re N.H. Disabilities Rights Ctr., Inc.*, 541 A.2d 208, 213 (N.H. 1988) (Souter, J.).

The Supreme Court emphasized this distinction in *Ohralik v. Ohio State Bar Ass'n*, the same day it decided *Primus*. 436 U.S. 447 (1978). In *Ohralik*, the Court rejected a challenge to an Ohio law forbidding in-person solicitation of clients. Solicitation of clients for commercial purposes, the Court held, did not implicate "political expression or an exercise of associational freedom" or "mutual assistance in asserting legal rights." *Id.* at 458.

As applied to CAI, North Carolina's UPL laws are closer to the statute in *Ohralik* than the statutes in the *Button* cases. While this case is admittedly close, several considerations distinguish CAI's proposed practice from the *Button* line of cases. First, what CAI seeks to accomplish would be for commercial ends and would address only private concerns. Second, it would not facilitate access to the courts. And third, it would pose ethical concerns not present in the *Button* cases.

When organizations like the NAACP and the ACLU solicit clients and retain lawyers to represent them, they express their commitment to expanding and guarding civil rights. *See Button*, 371 U.S. at 430–31; *Primus*, 436 U.S. at 428–30. CAI, in contrast, wants to help its members "resolv[e] private differences" by drafting legal documents and advising employers on labor and employment issues. *Button*, 371 U.S. at 429. Its goal, as set forth in its 2X plan, is to increase revenues and recruit new members who will pay dues and additional legal fees. CAI would charge by the hour for some services. While other services would be included in its membership fees, CAI's chairman said the trade association might increase its fees if it could practice law. CAI thus seeks to practice law for commercial ends, like a private attorney—not to associate for political or otherwise public goals. And while we accept that CAI engages in some expressive activity, CAI proposes to practice law for commercial ends, not to express a message.

Nor does CAI propose to engage in "collective activity undertaken to obtain meaningful access to the courts." *Primus*, 436 U.S. at 441 (quoting *United Transp. Union*, 401 U.S. at 585). As described in the record, CAI's members have consistently

11

had access to legal services and the courts. And CAI has no intention of litigating in any forum. So, unlike the organizations in the *Button* cases, CAI would not facilitate access to justice or vindicate its members' constitutional or statutory rights. *Cf. Trainmen*, 377 U.S. at 7–8. CAI's proposed practice might reduce some of its members' legal bills. But nothing in the record shows that CAI's inability to practice law means that its members can't "meet the costs of legal representation" or obtain "meaningful access to the courts." *United Transp. Union*, 401 U.S. at 585–86.

The Supreme Court has, moreover, extended associational rights only when the proposed practice of law wouldn't raise ethical concerns. *See Button*, 371 U.S. at 443; *Trainmen*, 377 U.S. at 6; *Primus*, 436 U.S. at 422, 429–30. CAI's proposed practice, in contrast, does raise ethical concerns. Specifically, its members would pay legal fees for representation by attorneys supervised by officers and directors who are not attorneys. That structure (even if housed in a nonprofit entity) could compromise the independence and professional judgment of the lawyers involved, and the corporation's interests could trump loyalty to clients.

In sum, several features of CAI's proposed practice distinguish it from the organizations in the *Button* cases. As a result, like the solicitation statute in *Ohralik*, North Carolina's UPL statutes "only marginally affect[] . . . First Amendment concerns." 436 U.S. at 459. Because they do not "substantially impair[] the associational rights" of CAI, we need not examine whether the state's interests suffice to justify them. *United Mine Workers*, 389 U.S. at 225; *see also Lawline*, 956 F.2d at 1387 (declining to apply

12

heightened scrutiny because there was no deprivation of associational rights). We hold that the UPL statutes do not violate CAI's associational rights.

IV.

Next, CAI argues that the UPL statutes unlawfully burden its freedom of speech. The district court rejected this claim based on the so-called "professional speech doctrine." *CAI*, 283 F. Supp. 3d at 385–86. When the district court ruled, this circuit and others applied lesser standards of scrutiny to professionals' speech to clients. *See Pickup v. Brown*, 740 F.3d 1208, 1228–31 (9th Cir. 2014); *King v. Governor*, 767 F.3d 216, 224–25, 228–29 (3d Cir. 2014); *Moore-King v. County of Chesterfield*, 708 F.3d 560, 569 (4th Cir. 2013). But after the briefing in this appeal, the Supreme Court disapproved of this doctrine as defined in *Pickup*, *King*, and *Moore-King*. *See Nat'l Inst. of Family & Life Advocates v. Becerra (NIFLA)*, 138 S. Ct. 2361, 2371–72, 2375 (2018).

In *NIFLA*, the Court addressed a California law requiring certain clinics that primarily serve pregnant women to post notices about what services they didn't offer and about free state services. *Id.* at 2368–70. Although the law applied in a professional context, the Court approached the case as it would any other involving compelled speech. *Id.* at 2374–75. It held that the law was content-based. *Id.* at 2371. And because it held that the law could not survive intermediate scrutiny, the Court declined to decide whether strict scrutiny should apply. *Id.* at 2375–77.

The Court did, however, recognize two situations in which states have broader authority to regulate the speech of professionals than that of nonprofessionals. First,

13

there is "more deferential review" for requirements that professionals "disclose factual, noncontroversial information" in their commercial speech. *Id.* at 2372. Second, "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* As examples of this latter category, the Court cited cases about malpractice, anticompetitive agreements, client solicitation, and informed consent. *Id.* at 2372–73.

On appeal, North Carolina describes the ban on corporate law practice as a regulation of professional conduct that incidentally burdens speech, which only needs to survive intermediate scrutiny. In contrast, CAI describes it as a content-based and identity-based regulation of speech that must survive strict scrutiny. As explained below, we agree with the state that the law passes—and only needs to pass—intermediate scrutiny.

A.

North Carolina's ban on the practice of law by corporations fits within *NIFLA*'s exception for professional regulations that incidentally affect speech. 138 S. Ct. at 2372–73. The ban is part of a generally applicable licensing regime that restricts the practice of law to bar members and entities owned by bar members. *Cf. Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) ("We recognize that the States have . . . broad power to establish standards for licensing practitioners and regulating the practice of professions."). In this case, any impact the UPL statutes have on speech is incidental to the overarching purpose of regulating who may practice law. *Cf. Lawline*, 956 F.2d at 1386 (holding that an ethical rule prohibiting lawyers from assisting in the unauthorized practice of law has only an incidental impact on speech).

14

Many laws that regulate the conduct of a profession or business place incidental burdens on speech, yet the Supreme Court has treated them differently than restrictions on speech. For example, while obtaining informed consent for abortion procedures implicates a doctor's speech, the state may require it "as part of the practice of medicine, subject to reasonable licensing and regulation." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (opinion of O'Connor, Kennedy, & Souter, JJ.). Bans on discrimination, price regulations, and laws against anticompetitive activities all implicate speech—some may implicate speech even more directly than licensing requirements. But the Supreme Court has analyzed them all as regulations of conduct. *See Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150–51 (2017); *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

As CAI recognizes, the practice of law has communicative and non-communicative aspects. The UPL statutes don't target the communicative aspects of practicing law, such as the advice lawyers may give to clients. Instead, they focus more broadly on the question of who may conduct themselves as a lawyer. Licensing laws inevitably have some effect on the speech of those who are not (or cannot be) licensed. But that effect is merely incidental to the primary objective of regulating the conduct of the profession.

B.

Having determined that the UPL statutes regulate conduct, we turn to the appropriate standard of review. CAI urges us to apply strict scrutiny, contending that the

15

UPL statutes restrict speech based on the content and on the speaker. We think the correct reading of Supreme Court precedent, however, is that intermediate scrutiny should apply to regulations of conduct that incidentally impact speech.

When the Supreme Court has reviewed restrictions on conduct that incidentally burden speech, it has not applied strict scrutiny. It has not, for example, demanded that laws against employment discrimination or anticompetitive agreements survive strict scrutiny. *See Rumsfeld*, 547 U.S. at 62; *Giboney*, 336 U.S. at 502. Price regulations too are not subject to strict scrutiny (though the standard for laws that only restrict communications about prices is unsettled). *Expressions Hair Design*, 137 S. Ct. at 1150–51. Even laws that implicate speech quite directly, such as laws requiring doctors—through spoken words—to obtain informed consent from patients before an abortion have not been subjected to strict scrutiny. *Casey*, 505 U.S. at 884 (opinion of O'Connor, Kennedy, & Souter, JJ.).

Although the Court's cases have not been crystal clear about the appropriate standard of review, we do know that the state actors involved were not required to demonstrate a compelling interest and narrow tailoring. And *NIFLA* itself provides ample support for the view that strict scrutiny shouldn't apply to the UPL statutes. As noted, the *NIFLA* Court chose not to decide whether strict or intermediate scrutiny applied to the law at issue. 138 S. Ct. at 2375–77. But the Court did highlight laws regulating "professional conduct" as an area in which it "has afforded *less* protection for professional speech." *Id.* at 2372 (emphasis added). Thus, we can say with some

16

confidence that the standard for conduct-regulating laws can't be greater than intermediate scrutiny.[4]

In sum, we hold that intermediate scrutiny is the appropriate standard for reviewing conduct regulations that incidentally impact speech. We think this a sensible result, as it fits neatly with the broad leeway that states have to regulate professions. *See Ohralik*, 436 U.S. at 460; *Goldfarb*, 421 U.S. at 792. For laws with only an incidental impact on speech, intermediate scrutiny strikes the appropriate balance between the states' police powers and individual rights.

## C.

We turn then to consider whether North Carolina's ban on the practice of law survives this standard of review. To survive intermediate scrutiny, the defendant must show "a substantial state interest" and a solution that is "sufficiently drawn" to protect that interest. *NIFLA*, 138 S. Ct. at 2375. North Carolina's interest in regulating the legal

---

[4] CAI describes the UPL statutes as content-based and identity-based restrictions on speech. Because the statutes regulate conduct, we need not engage with these descriptors. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 389–90 (1992). Content-based restrictions ordinarily receive strict scrutiny. *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226–27 (2015). But in many of the cases concerning conduct, a law had an incidental impact on speech with particular content—such as anticompetitive agreements, discriminatory statements, prices, or informed consent—yet the Supreme Court declined to apply strict scrutiny. The *NIFLA* Court mentioned such cases to illustrate an exception without any indication that they should receive strict scrutiny, *see* 138 S. Ct. at 2372–73, despite the sweeping language about content-based restrictions in some recent cases, *see Reed*, 135 S. Ct. at 2226–27. Finally, the Court has treated identity-based distinctions as part of the inquiry into content-neutrality, not as a separate reason for finding a statute unconstitutional. *See Reed*, 135 S. Ct. at 2230–31; *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994). Thus, labeling the UPL statutes an identity-based restriction doesn't change our analysis.

profession to protect clients is at least substantial. In fact, the Supreme Court has repeatedly described that interest in even stronger terms. *See Ohralik*, 436 U.S. at 460; *Goldfarb*, 421 U.S. at 792.

Barring corporations from practicing law is sufficiently drawn to protect that interest. Professional integrity could suffer if the state allows lawyers to practice on behalf of organizations owned and run by nonlawyers and to collect legal fees from clients. Nonlawyers would likely supervise lawyers representing third-party clients at CAI, which could compromise professional judgment and generate conflicts between client interests and the corporation's interests.

The state has addressed these problems by proscribing law practice by organizations that pose the most danger, while exempting organizations that pose little danger. Professional corporations, for example, must be owned exclusively by lawyers. N.C. Gen. Stat. § 55B-4(2). And public interest law firms "must have a governing structure that does not permit" anyone except an "attorney duly licensed . . . to control the manner or course of the legal services rendered." *Id.* § 84-5.1. Plus, the restrictions on the fees such firms may receive makes it impossible for them break even (much less turn a profit) on legal work. Rev. Proc. 92-59, 1992-2 C.B.

Another state legislature might balance the interests differently. But intermediate scrutiny requires only a "reasonable fit between the challenged regulation" and the state's interest—not the least restrictive means. *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (internal quotation marks omitted); *see Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480–81 (1989). Because North Carolina has established a reasonable

18

fit between its UPL statutes and a substantial government interest, the UPL statutes survive intermediate scrutiny.

## V.

CAI also argues that the UPL statutes deny it due process because they lack a rational basis. CAI doesn't contend that its due process claim concerns fundamental rights, so the UPL statutes are only subject to rational basis review. *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999) (en banc). To pass muster under rational basis review, legislation "need only be rationally related to a legitimate government interest." *Star Sci. Inc. v. Beales*, 278 F.3d 339, 348 (4th Cir. 2002).

The state relies on the same justifications it provided in response to the First Amendment claims. As our precedent counsels, "there is a rational basis to restrict corporate . . . ownership of professional businesses" to protect consumers. *Brown v. Hovatter*, 561 F.3d 357, 368 (4th Cir. 2009) (citing *N.D. State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.*, 414 U.S. 156, 166–67 (1973)). Accordingly, we agree with the district court that the state's justifications suffice. CAI's remaining arguments—such as the availability of less restrictive means—are inapposite for rational basis review. We hold that the UPL statutes do not deny CAI due process.

## VI.

CAI also contends that the UPL statutes are unconstitutionally vague because they fail to provide fair notice of what it means to practice law. A statute is unconstitutionally

19

vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). But "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

To determine if a statute is vague, we examine both the statute itself and any limiting constructions from state courts or agencies. *Martin v. Lloyd*, 700 F.3d 132, 136 (4th Cir. 2012). State law defines the term "practice law" as "performing any legal service." N.C. Gen. Stat. § 84-2.1(a). The statutory definition provides a lengthy but unexhaustive list of what does and doesn't count as a legal service. *Id.* §§ 84-2.1(b), 84-2.2. The statute prohibiting the unauthorized practice of law elaborates on the definition further. *Id.* § 84-4. And North Carolina courts have expounded on this definition at length.[5]

CAI's vagueness challenge fails. The statutes and state case law collectively provide an extensive definition of what it means to practice law. Between them, a person of ordinary intelligence would have fair notice of what the UPL statutes prohibit. Indeed,

---

[5] *See State v. Pledger*, 127 S.E.2d 337, 338–39 (N.C. 1962); *Seawell v. Carolina Motor Club*, 184 S.E. 540, 544 (N.C. 1936); *State v. Williams*, 650 S.E.2d 607, 611 (N.C. Ct. App. 2007); *Lexis-Nexis v. Travishan Corp.*, 573 S.E.2d 547, 549 (N.C. Ct. App. 2002); *Duke Power Co. v. Daniels*, 358 S.E.2d 87, 89 (N.C. Ct. App. 1987); *N.C. State Bar v. Lienguard, Inc.*, No. 11 CVS 7288, 2014 WL 1365418, at *10–12 (N.C. Super. Ct. Apr. 4, 2014).

CAI itself understood what it means to practice law well enough to avoid giving its members legal advice.

CAI points out that State Bar officials couldn't present a clear answer to every hypothetical question asked in their depositions. J.A. 670–76, 791–92. But fair notice doesn't require certainty about every hypothetical situation. *Ward*, 491 U.S. at 794. We hold, therefore, that the UPL statutes are not void for vagueness.

VII.

CAI next contends that the UPL statutes violate the state constitution's Monopoly Clause, which provides that "[p]erpetuities and monopolies . . . shall not be allowed." N.C. Const. art. I, § 34. To construe state law, we look to decisions of the state's highest court or, if needed, decisions of the state's intermediate appellate court. *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002 (4th Cir. 1998).

The Supreme Court of North Carolina has interpreted this clause to allow "reasonable regulations" of commerce with a substantial relationship to public health, safety, or welfare. *In re Certificate of Need for Aston Park Hosp., Inc.*, 193 S.E.2d 729, 735 (N.C. 1973); *see also Am. Motors Sales Corp. v. Peters*, 317 S.E.2d 351, 358–59 (N.C. 1984). That court has long been deferential toward professional regulations, regularly upholding professional licensing requirements.[6]

---

[6] *See State v. Warren*, 114 S.E.2d 660, 666 (N.C. 1960) (real estate brokers); *Roach v. City of Durham*, 169 S.E. 149, 151 (N.C. 1933) (plumbers); *State v. Lockey*, 152 S.E. 693, 696 (N.C. 1930) (barbers); *State v. Siler*, 84 S.E. 1015, 1016 (N.C. 1915) (Continued)

21

The state high court has twice upheld the ban on corporate law practice. In *Seawell*, the Supreme Court of North Carolina affirmed an injunction against a corporation for the unauthorized practice of law, holding that "[t]he statute in question offends neither the State nor Federal Constitution." 184 S.E. at 544. And in *Gardner v. North Carolina State Bar*, that court held that an insurance company could not employ an attorney to represent its insureds, finding that "[t]here is no merit to th[e] argument" that the ban on corporate practice "violates Article I of the [state constitution] and the Fourteenth Amendment." 341 S.E.2d 517, 523 (N.C. 1986). Although it is unclear whether *Seawell* and *Gardner* addressed Monopoly Clause arguments, they illustrate the leeway North Carolina courts give the legislature to regulate the legal profession.

*State v. Ballance*, 51 S.E.2d 731 (N.C. 1949), a case relied on by CAI, is not to the contrary. That case concerned a licensing requirement for professional photography, which the court described as "a private business unaffected in a legal sense with any public interest." *Id.* at 735. The court saw no serious dangers from unlicensed photography. *Id.*; *see also Roller v. Allen*, 96 S.E.2d 851, 859 (N.C. 1957) (invalidating licensing regime for tile layers for similar reasons). In contrast, it is well established that the practice of law affects the public interest and that the unregulated practice of law can pose a danger. *See Seawell*, 184 S.E. at 544; *In re Applicants for License*, 55 S.E. 635,

---

(doctors); *St. George v. Hardie*, 60 S.E. 920, 923 (N.C. 1908) (riverboat pilots); *State v. Hicks*, 57 S.E. 441, 442–43 (N.C. 1907) (dentists); *State v. Call*, 28 S.E. 517, 517 (N.C. 1897) (doctors).

636 (N.C. 1906); *cf. Ohralik*, 436 U.S. at 459–60.  Based on the applicable state case law, this court must conclude that the UPL statutes do not violate the Monopoly Clause.

## VIII.

Last, CAI argues that it has a free speech right to advertise the legal services it wants to offer.  But this commercial speech claim is not an independent basis for granting relief, and the state may forbid CAI from advertising legal services barred by law.  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563–64 (1980).

## IX.

The district court correctly granted the defendants' motion for summary judgment.  Its judgment is therefore

*AFFIRMED.*