**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 21-7512**

─────────────

ASKARI DANSO MS LUMUMBA, f/k/a Dale Lee Pughsley,

        Petitioner – Appellant,

   v.

JEFFREY KISER,

        Respondent – Appellee.

─────────────

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Norman K. Moon, Senior District Judge.  (7:20-cv-00379-NKM-JCH)

─────────────

Argued:  May 10, 2024                             Decided:  September 6, 2024

─────────────

Before WYNN, RICHARDSON, and RUSHING, Circuit Judges

─────────────

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Rushing joined.  Judge Wynn wrote an opinion concurring in part and dissenting in part.

─────────────

**ARGUED:**  Mary G. Triplett, Casey Schmidt, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant.  Kevin Michael Gallagher, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF:**  J. Scott Ballenger, Appellate Litigation Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant.  Jason S. Miyares, Attorney General, Theophani K. Stamos, Deputy Attorney General, Richard C. Vorhis, Senior Assistant Attorney General, Andrew N. Ferguson, Solicitor General, Erika L. Maley, Principal Deputy Solicitor General, Rick W. Eberstadt, Assistant Solicitor General,

OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

———————————

RICHARDSON, Circuit Judge:

Askari Lumumba filed a 28 U.S.C. § 2254 petition challenging a prison regulation that prohibits "[p]articipating in, or encouraging others to participate in, a work stoppage, or a group demonstration." J.A. 66. On appeal, he argues that the regulation is facially unconstitutional under the First Amendment and facially void for vagueness under the Fourteenth Amendment's Due Process Clause. But we find that Lumumba has failed to state a claim upon which relief can be granted. We therefore affirm the district's court order dismissing Lumumba's petition.

## I.      Background

### A.      Facts

In 1999, a Virginia state court jury convicted Askari Lumumba (known then as Dale Lee Pughsley) of second-degree murder, shooting into an unoccupied vehicle, possession of a firearm by a felon, and use of a firearm by a felon.[1] He was sentenced to fifty-eight years' imprisonment.

In July 2018, Lumumba was serving his sentence in Virginia's Sussex I state prison. While there, he engaged in a series of communications that eventually became the subject of disciplinary action. First, on July 2, he spoke on the phone with his wife. During the call, he stated: "Do you know how hard I'm fighting not to organize? Seeing you is the

---

[1] In assessing whether a 28 U.S.C. § 2254 petition states a claim for relief, we may consider the record from state habeas proceeding without having to convert the Federal Rule of Civil Procedure 12(b)(6) motion to one for summary judgment under Rule 56(b). *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009). We may also consider matters of public record, including documents from prior state court proceedings, pursuant to a Rule 12(b)(6) motion. *Id.*

only reason I'm not acting crazy." J.A. 55. He then said: "N[*]ggas is primed and ready. These young boys are ready to go." *Id.*. And he claimed that several Blood and Crip gang members had approached him about making him their "Big Homie," which means their leader.

Second, on July 6, Lumumba emailed Margaret Breslau, a non-incarcerated third party. Lumumba mentioned in the email that Breslau had forwarded him a message from "H," later determined to be H. Shabazz, an inmate at a different state prison. Then, in another section of the email titled "For H.", Lumumba wrote: "Look, these S1/S2 joints are severely understaffed! Word! Burh, I've been talking to brothers about a Gandhian Attica. Word, 'Blood in the Water' you feel me? Hundreds of people check in at once! We all want to go to the STAR program!" J.A. 54. He also stated: "Man, I'm telling you it's time to use the Art of War!" *Id.*

Third, on July 7, Lumumba sent a second email to Breslau, which she forwarded to Chanell Burnette, an inmate at a Virginia female prison. In that message, Lumumba wrote: "This involves a radical reeducation! I use the religious institutions that are legitimized by the state to do this." *Id.* "I'm new Afrikan," Lumumba continued, "and so I personally like to sue the Rastsfarian [] class to teach New Afrika[]/Pan Afrikanism[]/Afrikan[] Internationalism. It's tricky and require a bit of artistry but people will begin to respond." *Id.*

On July 9, 2018, prison investigators learned of the email communications and the phone call. The next day, they interviewed Lumumba, who claimed that he was just casually writing to Breslau, not attempting to organize anything among fellow inmates. He

4

also asserted that he supported peaceful reforms of the prison system and had told other inmates to "write up their issues without using violence." J.A. 55. When asked about his reference to a "Gandhian Attica," Lumumba explained that "Gandhian" referred to the political figure Mahatma Gandhi, while "Attica" referred to the prison riot in Attica, New York, in 1971.

That same day, Lumumba was transferred to Virginia's Red Onion State Prison. Officers there served him with a copy of a disciplinary report, which charged him with "attempt[ing] to garner support for a group demonstration that would disrupt the orderly operation of" the prison, in violation of Disciplinary Offense Code 128. J.A. 99. Offense Code 128 prohibits "[p]articipating in, or encouraging others to participate in, a work stoppage, or a group demonstration." J.A. 66.

Officer M. Counts conducted Lumumba's disciplinary hearing about a week after his transfer. At the hearing, an investigator testified that Lumumba "was attempting to garner support from other offenders to disrupt the orderly operation of Sussex I State Prison and other Virgina Department of Corrections facilities," introducing the emails and phone call as evidence. J.A. 56. After cross-examining the investigator, Lumumba acknowledged that he had authored the emails and placed the phone call. But, as he did in his interview, he claimed that he neither advocated violence nor intended to cause disruption. Officer Counts nonetheless concluded that Lumumba was guilty of violating Offense Code 128. *See* J.A. 101 ("I have found the intentions of [Lumumba] was to encourage others to participate in acts of violence against DOC."). So he imposed a penalty of 30 days in disciplinary segregation, with credit for time served, and 180 days' loss of good-conduct

5

sentence credits.[2]  Lumumba appealed to the Warden and then to the Regional Director, both of whom denied the petition.

Lumumba then petitioned for a writ of habeas corpus in the Supreme Court of Virginia.  But the Court denied the petition after finding that challenges to the calculation of a petitioner's good-conduct sentencing credits are not cognizable under Virginia law in a petition for state habeas corpus.  The Court later denied his petition for rehearing.

## B.      Procedural History

Unlike Virginia state habeas, challenges to deprivations of good-conduct sentencing credits are cognizable on federal habeas.  *See Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973); *Wall*, 21 F.4th at 271.  So Lumumba petitioned for habeas corpus under 28 U.S.C. § 2254 in federal district court.  In his statement of the issues, Lumumba advanced two claims: (1) Offense Code 128 is void for vagueness, in violation of the Fourteenth Amendment's Due Process Clause, because it fails to provide notice of the standard it uses; and (2) he is entitled to an evidentiary hearing on this matter.  As to the first claim, Lumumba, in a subsection titled "Overbreadth," cited the Supreme Court's decision in *Procunier v. Martinez*, 416 U.S. 396 (1974), and argued that he had "a right to speak critically of the government in outgoing correspondence."  J.A. 24–25.  He contended in the next two subsections that Offense Code 128 is void for vagueness.

---

[2] Under Virginia law, prisoners can obtain good-conduct sentencing credits "as a result of good conduct while in prison" and can use them to get "a reduction of th[eir] sentence."  *Wall v. Kiser*, 21 F.4th 266, 271 (4th Cir. 2021).

Jeffrey Kiser, Warden of Red Onion State Prison, moved to dismiss the petition. The district court granted the motion, dismissing Lumumba's petition with prejudice. The court first held that Offense Code 128 is not void for vagueness, for, while it "certainly prohibits a wide range of conduct, . . . it is not 'vague' in the sense that it is unclear what it proscribes." J.A. 119. The court then rejected what it interpreted as Lumumba's argument that Offense Code 128 is facially overbroad under the First Amendment, finding that the regulation satisfies the standard set forth in *Turner v. Safley*, 482 U.S. 78 (1987).

Lumumba requested a certificate of appealability from the district court and filed a notice of appeal. We subsequently remanded to the district court to supplement the record with an order granting or denying a certificate of appealability. The district court granted a certificate of appealability on January 25, 2022, permitting Lumumba to appeal its holdings that Offense Code 128 were valid under "the void-for-vagueness and overbreadth doctrines." *Lumumba v. Kiser*, No. 7:20-cv-379, 2022 WL 228318, at *1 (W.D. Va. Jan. 25, 2022).[3]

---

[3] When a state court adjudicates a habeas petition on the merits, we may grant relief only if the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). By contrast, "when a state court does not adjudicate a claim on the merits, [such] deference is inappropriate and [we] must review the claim de novo," *Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012), "unless the state court found the claim procedurally defaulted," *Richardson v. Kornegay*, 3 F.4th 687, 695 (4th Cir. 2021).

Before petitioning under § 2254, Lumumba first sought relief in Virginia state court. But the Virginia Supreme Court determined that claims like his—challenges to revocation of accrued good-conduct sentencing credits—are not cognizable in state habeas, so it dismissed for lack of jurisdiction without reaching the merits. In *Wall v. Kiser*, we faced the same situation and found that the Virginia Supreme Court did not adjudicate the claims
(Continued)

## II.    Discussion

This appeal presents two issues.[4]  First, Lumumba argues that Offense Code 128 is facially unconstitutional under the First Amendment because it abridges prisoners' freedom of speech.  Second, Lumumba argues that Offense Code 128 is unconstitutional under the Due Process Clause of the Fourteenth Amendment because it is facially void for vagueness.  We address each argument in turn, finding neither convincing.  Accordingly, we affirm the district court.

### A.    First Amendment Challenge

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  And "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Turner*, 482 U.S. at

---

on the merits.  *See* 21 F.4th at 272–73.  Therefore, rather than reviewing Lumumba's claims under § 2254(d)'s substantial-deference regime, we review them de novo.

[4] Lumumba claims that this appeal also involves a First Amendment challenge to Offense Code 128 as applied to his particular conduct.  But Lumumba labelled his claim below as an "Overbreadth" claim, J.A. 24, and cited the Supreme Court's decision in *Martinez*, 416 U.S. at 404, which involved a facial First Amendment challenge.  Likely for this reason, the district court interpreted his petition to raise a facial First Amendment challenge and resolved the case on that basis.  The district court then granted a certificate of appealability for review of the merits of that overbreadth claim and the void-for-vagueness claim.  *Lumumba*, 2022 WL 228318, at *1 ("Petitioner may appeal the Court's merits holdings on the void-for-vagueness and overbreadth doctrines.").  Because the certificate of appealability does not include an as-applied challenge, we are precluded from considering one in this appeal.  *See* 28 U.S.C. § 2253(c)(3) (providing that a certificate of appealability must "indicate which specific issues or issues" make the required showing for issuing the certificate); *Gonzalez v. Thaler*, 565 U.S. 134, 145 (2012) (explaining that certificates of appealability "screen[] out issues unworthy of judicial time and attention and ensure[] that frivolous claims are not assigned to merits panels"); *see also Cox v. Weber*, 102 F.4th 663, 673–74 (4th Cir. 2024).

8

84.   At the same time, however, the Supreme Court recognized in *Turner* that certain constitutional rights are "inconsistent" with proper incarceration.  *See id*. at 95; *Johnson*, 543 U.S. at 510.  "This is because certain privileges and rights must necessarily be limited in the prison context" in order to ensure prison and prisoner safety and security.  *See Johnson*, 543 U.S. at 510.  For such rights, prison administrators deserve great deference to act in the best interest of their institutions.  482 U.S. at 84–85.  So the Court in *Turner* established that, when a prisoner claims that a prison practice or regulation is invalid because it impinges on his constitutional rights,[5] he prevails only if he shows the prison's policy is not "reasonably related to legitimate penological interests."  *Id.* at 89.

> To determine whether a prison policy satisfies *Turner*, we consider four factors:
>
> (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> (2) whether there are alternative means of exercising the right that remain open to prison inmates;
>
> (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
>
> (4) whether there are ready alternatives.

*Firewalker-Fields v. Lee*, 58 F.4th 104, 115 (4th Cir. 2023) (quoting *Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019)); *see also Turner*, 482 U.S. at 89–91.  In applying these factors, we afford substantial deference to prison officials' judgment, particularly with

---

[5] Before we even consider a policy's reasonableness under *Turner*, a prisoner must first show that the policy impinges on his constitutional rights.  *See Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 356 (4th Cir. 2021).  Here, Kiser does not dispute that Offense Code 128 impinges on Lumumba's freedom of speech, so we focus only on the reasonableness inquiry.

9

respect to the third factor. *Firewalker-Fields*, 58 F.4th at 115. "The burden is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015) (cleaned up) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

Lumumba insists that we start on the wrong foot by applying *Turner*. Relying on *Johnson v. California*, 543 U.S. 499 (2005), he argues that *Turner* applies "*only* to rights that are 'inconsistent with proper incarceration,'" *id.* at 510 (quoting *Overton*, 539 U.S. at 131), but not to "*structural* constraints on state action," Opening Br. at 36–37. And he contends that overbreadth challenges fall into the second bucket, such that they should assessed according to the normal standards that apply outside prison walls. *See United States v. Hansen*, 599 U.S. 762, 770 (2023) (explaining that an overbreadth challenger must demonstrate "that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep'" (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).

We refuse to abandon *Turner* in this context. The Court in *Johnson* never distinguished between rights-based and "structural" challenges. Rather, it distinguished between rights inconsistent and consistent with proper incarceration and determined that the right at issue there, "[t]he right not to be discriminated against based on one's race," falls into the latter category. *Johnson*, 543 U.S. at 510. The Court also recognized that it has repeatedly held that First Amendment rights—including the freedom of speech—*do*

10

fall within *Turner*'s ambit. *Id*. at 510.[6] And overbreadth doctrine is not some separate

"structural" constraint on state action, but a kind of facial challenge to laws that burden the

freedom of speech. *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). Because

*Turner* establishes the standard for vindicating First Amendment rights in prison, we hold

that Lumumba cannot bring an overbreadth challenge separate from *Turner*.[7]

> **1.      Offense Code 128 prohibits participating in or encouraging other prisoners to participate in public displays of group opinion on political or other issues within Virginia correctional facilities.**

Before applying *Turner*, we consider the scope of the challenged regulation.

Offense Code 128 prohibits "[p]articipating in, or encouraging *others* to participate in, a

work stoppage, or a *group demonstration*." J.A. 66 (emphasis added). The parties dispute

how far this prohibition extends. According to Lumumba, the term "group demonstration"

is very open-ended and covers any "outward exhibition of feeling" by two or more people,

---

[6] *See Turner*, 482 U.S. at 89–91 (restriction on correspondence); *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348–50 (1987) (restriction on attending religious services); *Thornburgh v. Abbott*, 490 U.S. 401, 406–14 (1989) (restriction on receipt of subscription publications); *Lewis v. Casey*, 518 U.S. 343, 361–62 (1996) (restriction on access to courts); *Shaw v. Murphy*, 532 U.S. 223, 228–32 (2001) (restriction on correspondence); *Overton*, 539 U.S. at 131–32 (restriction on freedom of association). The Supreme Court has never addressed whether or how *Turner* might apply to the Establishment Clause.

[7] Alternatively, Lumumba argues that the stricter standard set forth in *Martinez*, 416 U.S. at 412–15, should govern here. But the Supreme Court and our Circuit have narrowly cabined *Martinez* to cases involving *censorship* of *outgoing* personal correspondence from prisoners. *See Thornburgh*, 490 U.S. at 409–14; *Altizer v. Deeds*, 191 F.3d 540, 548 (4th Cir. 1999); *see also Matherly v. Andrews*, 859 F.3d 264, 281 (4th Cir. 2017). For all other First Amendment free-speech claims brought by prisoners, *Turner* supplies the controlling standard. *See Turner*, 482 U.S. at 84–89; *Thornburg*, 490 U.S. at 409. Because, as we will explain shortly, Offense Code 128 prohibits certain speech directed at other prisoners, *Turner* controls here.

11

including "a worship service, sitting in a prayer circle, organizing a workout, creating an art project, composing music, or observing a religious or patriotic holiday." Opening Br. at 32. And because the term "others" is undefined and sweeping, Lumumba argues that Offense Code 128 prohibits encouraging even non-prisoners to participate in a group demonstration. Kiser, by contrast, insists that it is limited to public, group expressions of opinion within Virginia correctional facilities on political or other matters.[8]

"[W]e start where we always do: with the text of the [regulation]." *Van Buren v. United States*, 593 U.S. 374, 381 (2021).[9] As Lumumba correctly notes, the term "demonstration" can, in some contexts, encompass any outward display of sentiment or affection. But this meaning normally inheres in the context of *individual* demonstrations. *See, e.g.*, *Demonstration*, *American Heritage Dictionary of the English Language* (5th ed. 2016) ("An expression or manifestation, as of one's feelings: *a demonstration of her displeasure*."); *Demonstration*, *Oxford English Dictionary*, https://doi.org/10.1093/OED/2254065070 (Sept. 2023) ("An exhibition or outward display of a quality or feeling," for example, "Mr. Bush made a public demonstration of willingness to honor the traditional rules of the game"). Offense Code 128, by contrast, refers to

---

[8] The parties do not address or dispute the meaning of "participating" or "encouraging." We presume that these words carry their ordinary meaning. *See Encourage*, *Merriam Webster's Collegiate Dictionary* (11th ed. 2020) ("to attempt to persuade"); *Participate*, *id.* ("to take part").

[9] Offense Code 128 is part of the Virginia Department of Correction's Operating Procedure, which was promulgated under the Director of Correction's rulemaking authority. *See* Va. Code § 53.1-25. Virginia courts interpret state regulations according to their plain meaning when they are unambiguous. *Chesapeake Hosp. Auth. v. State Health Comm'r*, 301 Va. 82, 93, 872 S.E.2d 440, 446 (2022). So we do the same here.

demonstrations by *groups*. When used in the context of group activity, "demonstration" more narrowly refers to a public display of group opinion on political or other issues, such as a protest or rally. *See Demonstration*, *American Heritage Dictionary*, *supra* ("A public display of group opinion, as by a rally or march: *peace demonstrations*."); *Demonstration*, *Oxford English Dictionary*, *supra* ("A public march or rally expressing an opinion about a political or other issue; esp. one in protest against or support of something," for example, "Activists participating in the massive New York demonstration for nuclear disarmament"); *Demonstration*, *Webster's Third New International Dictionary* (1981) ("[A] public display of group feeling (as of approval, sympathy, or antagonism) esp. towards a person, cause, or action of public interest," for example, "while the delegates are howling and conducting their [demonstrations], the leaders may be quietly engaged in the highest statesmanship"). Offense Code 128 is most plausibly read to prohibit only this narrow form of group demonstration, not the broader kind of individual demonstration that Lumumba identifies.

This reading of the regulation is confirmed by the surrounding language. *See Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) ("[A] word is known by the company it keeps."). Offense Code 128 doesn't just prohibit group demonstrations; it also prohibits prisoners from participating in or encouraging others to participate in a "work stoppage." A work stoppage is "[a] cessation of work by a group of employees as a means of protest." *Work Stoppage*, *American Heritage Dictionary*, *supra*; *accord Work Stoppage*, *Merriam-Webster's Collegiate Dictionary*, *supra*. In other words, it is a kind of concerted group activity intended to convey a message. This definition informs the meaning of

13

"group demonstration" because it is a noun in a series with work stoppage. When several nouns . . . are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar." Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012). Accordingly, we find that "group demonstration" in Offense Code 128 refers only to a public display of group opinion on political or other social issues.

What about encouraging "others" to participate? On its face, this term could refer to anyone in the world or just to a smaller subset of people. But "[w]hen words have several plausible definitions, context differentiates among them." *Hansen*, 599 U.S. at 775. Here, context indicates that "others" refers only to fellow prisoners. Offense Code 128 is, after all, a prison disciplinary regulation. And the offenses, penalties, and disciplinary procedures in Virginia's regulations are "for all offenders incarcerated in the Department of Corrections institutions" and "appl[y] to all institutions operated by the Department of Corrections (DOC)." J.A. 59. Given this context, Offense Code 128 appears to only govern interactions between prisoners within Virginia correctional facilities, not interactions between prisoners and anyone in the outside world.

This reading is supported by the fact that when a Virginia prison regulation applies to words or conduct directed at non-prisoners, it specifically says so. *See* Scalia & Garner, *supra*, at 170 ("[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea."); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115–16 (2001). For example, Offense Code 136 prohibits threats or intimidation of "public officials" or "member[s] of

14

the general public." J.A. 67. Similarly, Offense Code 222 prohibits "[v]ulgar or insolent language, gestures, or actions directed toward an employee, or directed toward, or in the presence of, persons who are not offenders or not employed by DOC (general public, volunteers, and visitors)." J.A. 69. And Offense Code 232 proscribes "[u]nauthorized contact with or harassment of any private citizen or off duty employee, in person, by mail, or by telephone or other communication system/device." *Id.* As these examples show, when an offense applies to actions directed at non-prisoners, it ordinarily says so. But Offense Code 128 does not say so; it merely refers to "others." The most plausible reading of "others," therefore, is that it refers only to other Virginia prisoners, not to anyone in the world.

In the end, Lumumba may be right that Offense Code 128, read in a vacuum, has a wide ambit. But read in context, the plain meaning of its words indicates a narrower meaning. Offense Code 128 prohibits prisoners from participating in or encouraging other prisoners to participate in public displays of group opinion on political or other social issues within Virginia correctional facilities. It does not, however, prohibit any conceivable expression of sentiment or feeling directed at anyone in the world.

### 2. Offense Code 128 does not facially violate the First Amendment.

Now that we have defined Offense Code 128, we can determine whether it is consistent with the First Amendment. Under *Turner*'s framework, we first consider whether there is "a valid, rational connection" between the prison regulation and a "legitimate penological interest." 482 U.S. at 89 (citation omitted). A regulation fails this prong if the "logical connection" between it and the prison's asserted interest "is so remote

15

as to render the policy arbitrary or irrational." *Id.* at 89–90. The prison bears the burden of offering the interests that support its policy. *Firewalker-Fields*, 58 F.4th at 117.

As Lumumba effectively acknowledges, this factor weighs in Kiser's favor. Kiser explains that Offense Code 128 promotes order, discipline, and security in the Virginia prison system. These are legitimate penological interests, *Martinez*, 416 U.S. at 412. And restricting group demonstrations is a reasonable way to promote these interests. Group demonstrations can disrupt the normal order of prison operations and unsettle the disciplinary efforts undertaken therein. *Pilgrim v. Luther*, 571 F.3d 201, 205 (2d Cir. 2009). They also can balloon into full-scale riots, which pose a danger to prison officers and other inmates. *See Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 132–33 (1977); *cf. Overton*, 539 U.S. at 134 ("[C]ommunication with other felons is a potential spur to criminal behavior." (citation and internal quotation marks omitted)). Prohibiting participation in or encouragement of such demonstrations is therefore a valid and reasonable way to preserve order, discipline, and security within prison walls.

Second, we consider whether "there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. A lack of alternatives does not automatically doom a regulation, but it does provide "some evidence that the regulation[] [is] unreasonable." *Overton*, 539 U.S. at 135. Importantly, when assessing this factor, "the right in question must be viewed sensibly and expansively." *Thornburgh*, 490 U.S. at 417 (cleaned up); *see also Firewalker-Fields*, 58 F.4th at 117.

This factor leans in Kiser's favor, too. Lumumba claims that Offense Code 128 prevents prisoners from ever expressing their grievances with prison administration. But

16

this is based on his mistaken belief that Offense Code 128 applies to "any mode of communication" that a prisoner employs. Opening Br. at 29. Under that belief, there may not be any alternatives. In reality, Offense Code 128 only prohibits prisoners from communicating grievances through work stoppages or group demonstrations. Other ways to express grievances remain available, including filing an official complaint with the prison. *See Watkins v. Kasper*, 599 F.3d 791, 797 (7th Cir. 2010). And since these alternatives exists, this factor cuts against Lumumba.

Third, we consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. When a potential accommodation will have a "significant 'ripple effect,'" *id.*, we must be particularly deferential to prison officials, *Firewalker-Fields*, 58 F.4th at 117.

Like the first two factors, this one favors Kiser. Much of Lumumba's argument on this prong is based on his own conduct, which he insists was nonviolent, "abstract advocacy." Opening Br. at 29. But Lumumba's conduct, as already discussed, involves more than his conduct in isolation. It involves group demonstrations which can "pose additional and unwarranted problems and frictions" between prisoners and officers. *See Jones*, 433 U.S. at 129. Accommodating group demonstrations therefore forces a prison to undertake safeguards to ensure that the demonstration does not get out of hand. That puts a "drain on scarce . . . resources," *See O'Lone*, 482 U.S. at 353 (citation omitted).

Finally, we consider possible alternative policies. *Turner*, 482 U.S. at 90. The "absence of ready alternatives is evidence of the reasonableness of a prison regulation"

17

while the presence of "obvious, easy alternatives" may suggest that it is unreasonable. *Id.* Yet "[t]his is not a least-restrictive-alternative test; it looks for easy and obvious alternatives that do not 'impos[e] more than a de minimis cost to the valid penological goal.'" *Firewalker-Fields*, 58 F.4th at 118 (alteration in original) (quoting *Overton*, 539 U.S. at 136). The prisoner ultimately bears the burden to propose reasonable alternatives. *Id.*

Lumumba has failed to carry his burden on this factor. On appeal, he proposes a "more narrowly drafted rule" that would impose "restrictions on speech that is actually disruptive, or that actually threatens disruption." Opening Br. at 11, 38–41. But Lumumba forfeited this argument by failing to suggest it or any other alternative to the prison, in his habeas petition, or in his district court briefing. *Firewalker-Fields*, 58 F.4th at 120 ("Because he pitched none of these creative solutions to the prison at the time, he cannot use them after the fact to prove that the prison's rules were not reasonable."). And even if we ignored this forfeiture, Lumumba's proposed alternative would still fail. Prisons have a strong and legitimate interest in adopting prophylactic rules that head off activities that are likely to cause violence or disruption, even if those activities are not themselves violent or disruptive. *Jones*, 433 U.S. at 132–33 ("Responsible prison officials must be permitted to take reasonable steps to forestall [] threat[s], and they must be permitted to act before the time when they can compile a dossier on the eve of a riot."). Requiring prison officials to wait until riots break out would jeopardize prison security and risk danger to officers and other prisoners. Accordingly, Lumumba's proposed alternative is neither easy, obvious, nor low-cost.

Lumumba has failed to show that Offense Code 128 is unreasonable under *Turner*. The district court was thus correct to rule that his petition fails to state a viable First Amendment claim.

## B.      Void for Vagueness Challenge

Besides his First Amendment claim, Lumumba also argues that Offense Code 128 is unconstitutionally vague.  The Due Process Clause of the Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. xiv.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Station, Inc.*, 567 U.S. 239, 253 (2012). The government violates this prohibition when it deprives someone of life, liberty, or property pursuant to a statute or regulation that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 165 (1972).  When a regulation "interferes with the right of free speech or of association," the Supreme Court has advised that "a more stringent vagueness test should apply." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489, 499 (1982)). Here, Lumumba argues that Offense Code 128 is facially void for vagueness because it

19

fails to provide adequate notice of the conduct it prohibits and vests significant discretion in prison officials, thus inviting arbitrary and discriminatory enforcement.[10]

Not just any litigant can bring a facial vagueness challenge, however. "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Humanitarian L. Project*, 561 U.S. at 18–19; *United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016) ("[I]f a law clearly prohibits a defendant's conduct, the defendant cannot challenge, and a court cannot examine,

---

[10] Kiser argues that we need not conduct a separate void-for-vagueness inquiry because Offense Code 128 is constitutional under *Turner*. But whether *Turner* supplants traditional vagueness doctrine for prisoners is a difficult question that we need not resolve today. Unlike the First Amendment, the Supreme Court has never addressed whether void-for-vagueness principles apply in prisons. Other circuits are split over this question. *Compare Waterman v. Farmer*, 183 F.3d 208, 212–14 (3d Cir. 1999) (concluding that vagueness doctrine does not apply independently from *Turner* in the prison context), *and Bahrampour v. Lampert*, 356 F.3d 969, 975–76 (9th Cir. 2004) (same), *with Reynolds v. Quiros*, 25 F.4th 72, 95–96 (2d Cir. 2022) (analyzing a prison regulation under the vagueness doctrine separate from *Turner*), *Jones v. Caruso*, 569 F.3d 258, 276–77 (6th Cir. 2009) (same), *and Koutnik v. Brown*, 456 F.3d 777, 783–84 (7th Cir. 2006) (same); *see also Amatel v. Reno*, 156 F.3d 192, 203 (D.C. Cir. 1998) (remanding for the district court to decide this question). Moreover, there are plausible reasons to think that the right not to be subject to vague laws is consistent with incarceration. *See Johnson*, 543 U.S. at 510. Providing notice of prohibited conduct to regulated parties is "not only consistent with proper prison administration," *id.*, but arguably the only way good administration is possible—people can only follow rules if they know what the rules demand of them, *cf. Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926); *see also* Lon L. Fuller, *The Morality of Law* 35–36, 63–65 (rev. ed. 1969). And preventing vague prohibitions "bolsters the legitimacy of the entire criminal justice system," *Johnson*, 543 U.S. at 511, as it ensures that every prisoner is treated with fundamental fairness and respect, *see Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *see also* John Finnis, *Natural Law & Natural Rights* 270–73 (2d ed. 2011). Thus, it is not obvious that *Turner* supplants traditional vagueness doctrine in the prison context. We need not decide this question today, however; because we ultimately conclude that Offense Code 128 is constitutional even under normal void-for-vagueness principles, we will assume, without deciding, that such principles apply here.

whether the law may be vague for other hypothetical defendants.").  This is true "even to the extent a heightened vagueness standard applies" due to First Amendment implications; for the "rule makes no exception for conduct in the form of speech."  *Humanitarian L. Project*, 561 U.S. at 20; *see also Fusaro v. Howard*, 19 4th 357, 374 (4th Cir. 2021).  So if Offense Code 128 clearly proscribes Lumumba's conduct, he cannot successfully challenge it as unconstitutionally vague.

Offense Code 128 clearly proscribes Lumumba's conduct.  Remember, Offense Code 128 prohibits prisoners from participating in or encouraging other prisoners to participate in public displays of group opinion within Virginia correctional facilities.  We agree with the district court that "[t]he evidence presented at Lumumba's disciplinary hearing clearly suggested that he was planning to lead some sort of non-violent civil disobedience campaign—exactly the kind of conduct forbidden by Disciplinary Offense Code 128."  J.A. 119.  The record from Lumumba's disciplinary proceedings indicates that he was punished for "attempt[ing] to garner support for a group demonstration that would disrupt the orderly operation of Sussex I State prison."  J.A. 54; *see also* J.A. 101 ("[Lumumba] had attempted to garner support for a group demonstration that would disrupt the orderly operation of the institution.").  This finding was backed by multiple pieces of evidence indicating that Lumumba had attempted organizing a mass demonstration among Virginia inmates.  So Lumumba was clearly engaging in precisely the sort of conduct that

21

Offense Code 128 prohibits. As a result, he cannot challenge the regulation as facially vague.[11]

Even if his own conduct were not clearly proscribed, Lumumba's vagueness challenge would still fail. A litigant must make a high showing before we will strike down a regulation as void for vagueness. "That some smidgen of ambiguity remains is no reason to find a statute unconstitutionally vague." *Recht v. Morrisey*, 32 F.4th 398, 415 (4th Cir. 2022). A law is not void for vagueness so long as it "(1) establishes minimal guidelines to govern law enforcement, and (2) gives reasonable notice of the proscribed conduct." *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998) (internal quotation marks omitted). In other words, "a court considering a vagueness challenge must determine if the statutory prohibitions 'are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.'" *United States v. Whorley*, 550 F.3d 326, 333 (4th Cir. 2008) (cleaned up) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 608 (1973)).[12]

---

[11] Lumumba insists that he was not attempting to organize a demonstration but was merely expressing a desire for non-violent advocacy to a non-prisoner (*i.e.*, Breslau). Yet this appeal does not involve a sufficiency-of-the-evidence challenge to the prison's disciplinary ruling. Whether or not he was guilty, Lumumba was adjudged to have attempted to encourage other inmates to participate in some kind of group demonstration.

[12] "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests.*, 455 U.S. at 498. For this reason, our sister circuits generally demand less specificity from prison regulations than they do from ordinary criminal laws. *See, e.g.*, *Adams v. Gunnell*, 729 F.2d 362, 369-70 (5th Cir. 1984); *Wolfel v. Morris*, 972 F.2d 712, 717 (6th Cir. 1992); *Meyers v. Aldredge*, 492 F.2d 296, 310 (3d Cir. 1974); *Reynolds*, 25 F.4th at 96; *Koutnik*, 456 F.3d at 783.

We conclude that Offense Code 128 is not facially vague. Though the regulations do not explicitly define words like "encourage," "others," or "group demonstration," we have already explained that these words have determinate, ordinary meanings that apply to a fixed range of conduct. *See Fusaro*, 19 F.4th at 371 (explaining that the void-for-vagueness inquiry "is aided by both 'dictionary definitions and old-fashioned common sense'" (quoting *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012)). Moreover, Offense Code 128 utilizes "run-of-the-mill statutory phrases" that have been "upheld by other courts in the face of vagueness challenges." *Recht*, 32 F.4th at 415; *see, e.g.*, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 383 (1997) ("demonstrating"); *Sword v. Fox*, 446 F.2d 1091, 1100 (4th Cir. 1971) ("demonstration"); *United States v. Anderton*, 901 F.3d 278, 283 (5th Cir. 2018) ("encourage"). So Offense Code 128 is not unconstitutionally vague.

\*            \*            \*

Prison administrators deserve substantial deference to design policies and procedures in the best interests of their institutions. Accordingly, the bar for successfully mounting a constitutional challenge against prison policies is high. We conclude that Lumumba has not cleared that bar here. So the district court's order is

*AFFIRMED.*

23

WYNN, Circuit Judge, concurring in part and dissenting in part:[1]

We are bound to liberally construe pro se pleadings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). So construed, Lumumba's pro se petition includes an as-applied First Amendment challenge alongside the facial challenges addressed in the majority opinion.[2] The majority, like the district court, errs by concluding otherwise. Because the district court did not consider Lumumba's as-applied First Amendment challenge, I would vacate the district court's opinion in relevant part and remand for review of that claim.[3]

Courts must liberally construe all pro se filings and complaints, "however inartfully pleaded." *Erickson*, 551 U.S. at 94 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "[T]his liberal construction allows courts to recognize claims despite various formal deficiencies, such as incorrect labels or lack of cited legal authority." *Wall v. Rasnick*, 42 F.4th 214, 218 (4th Cir. 2022). Courts must often "recharacterize" a filing to which a pro se litigant has attached the wrong label to "avoid an unnecessary dismissal, to avoid inappropriately stringent application of formal labeling requirements, or to create a better

---

[1] While I am troubled by the sweeping breadth of Code 128, I agree with the majority opinion that Lumumba's facial overbreadth and vagueness claims fail.

[2] Lumumba's petition also raises an as-applied vagueness challenge, but I agree with the majority opinion that such a challenge fails.

[3] We have jurisdiction to determine whether the district court properly considered the scope of Lumumba's claims. The district court granted a certificate of appealability to review its "holding[] on the . . . overbreadth doctrine[]." *Lumumba v. Kiser*, No. 7:20-cv-379, 2022 WL 228318, at *1 (W.D. Va. Jan. 25, 2022). Our analysis of whether the district court erred in reaching its holding on the overbreadth doctrine necessarily requires us to examine whether the district court properly considered the scope of the issue before it.

24

correspondence between the substance of a *pro se* motion's claim and its underlying legal basis." *Castro v. United States*, 540 U.S. 375, 381–82 (2003) (citations omitted); *see also Fitz v. Terry*, 877 F.2d 59, 1989 WL 64157, at *2 (4th Cir. 1989) (per curiam, unpublished table decision) ("[L]iberal construction requires active interpretation in some cases.").

This liberal construction is especially critical when deciphering whether a complaint raises as-applied or facial challenges. Indeed, even when a plaintiff is represented by counsel, "[t]he label [of 'as-applied' or 'facial'] is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). That's because the line between the two types of challenges is "amorphous," *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012), meaning it is "not so well defined that it has some automatic effect or that it must always control the pleadings," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). And if the distinction between as-applied and facial challenges is murky even for judges, we must grant pro se litigants considerable leeway when characterizing their claims.

Here, the majority opinion correctly notes that Lumumba's petition did not explicitly label his claim as an "as-applied" challenge. Maj. Op. at 8 n.4. However, though inartful, Lumumba's petition clearly articulates his belief that Code 128 is not only facially unconstitutional, *e.g.*, J.A. 26 ("Offense Code 128 is facially insufficient[.]"), but *also* unconstitutional as applied to his particular speech, *e.g.*, J.A. 24 (discussing First Amendment protections for outgoing prison correspondence); J.A. 25 (twice referencing "the Petitioner's" First Amendment rights, twice discussing "*Petitioner's*" own right to criticize the government in "*his 'outgoing' correspondence*," and specifically referencing

his speech in his emails and phone calls (emphases added)).[4] These allegations discuss how the enforcement of Code 128 against Lumumba's specific speech violated his rights, which is paradigmatic of an as-applied challenge. *See Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 204 (4th Cir. 2019) (defining as-applied challenges as those "which test the constitutionality of a statute applied to the plaintiff based on the record").

The majority opinion also refuses to acknowledge Lumumba's as-applied challenge because he cited *Procunier v. Martinez*, 416 U.S. 396 (1974), in his petition, and *Martinez* involved a facial challenge. Maj. Op. at 8 n.4. The majority opinion gets this backward: Lumumba's citation of *Martinez supports* reading his petition as intending to raise an as-applied challenge. The Supreme Court held in *Martinez*, and later clarified in *Thornburgh v. Abbott*, 490 U.S. 401 (1989)—which Lumumba also cited—that intermediate scrutiny applies to the review of First Amendment challenges to the regulation of *outgoing* prison correspondence. *See Martinez*, 416 U.S. at 412–14; *Thornburgh*, 490 U.S. at 412–13. This is the precise matter at issue in Lumumba's own case. So, in citing *Martinez* and *Thornburgh*, Lumumba was highlighting how courts should review the particular way in which Code 128 was enforced against him, not how courts might review the Code's application more generally. And, critically, nothing in the logic or holding of *Martinez* is

---

[4] At oral argument, my colleague in the majority and Kiser agreed that the district court itself appeared to have mistakenly conducted an as-applied analysis of Lumumba's First Amendment claim, despite labeling the claim as facial. Oral Arg. at 25:20–29:10, available at https://www.ca4.uscourts.gov/OAarchive/mp3/21-7512-20240510.mp3. Notwithstanding this acknowledgment, the majority now inexplicably holds Lumumba to a "stringent application of formal labeling requirements." *Castro*, 540 U.S. at 381.

26

limited to facial challenges. Thus, while the majority opinion is correct to analyze Lumumba's facial challenge under *Turner* because most applications of Code 128 involve internal prison speech, *Martinez* is the appropriate case to use in analyzing Lumumba's as-applied challenge, and Lumumba's reliance on *Martinez* in his petition supports that he raised such a claim.

In sum, by failing to consider an as-applied First Amendment claim, the district court did not construe Lumumba's pro se petition liberally. I would accordingly vacate in part and remand with instructions for the district court to consider Lumumba's as-applied First Amendment challenge under the *Martinez* standard for outgoing correspondence.

27